[Crim. No. 5085. In Bank. June 13, 1950.]

THE PEOPLE, Respondent, v. LUIS LOPEZ MENDES, Appellant.

Thomas C. Perkins and John D. McComish for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

TRAYNOR, J.—At about 7:30 p. m. on August 30, 1949, defendant, a 20-year-old Mexican farm laborer, together with Gonzales and Sandoval, entered the La Moderna Café in

Grimes, California and embarked upon an evening of beer drinking. They had originally set out to take Gonzales from Colusa to his home in Arbuckle at the request of Maria Coronado. Maria was the common-law wife of Sandoval and the mother-in-law of defendant. Gonzales was a friend of the family. A tall man, a stranger to defendant but a friend of Gonzales, either accompanied the group from Colusa to Grimes or joined them in the café. Early in the evening he and defendant had an argument. It is not clear who was the aggressor, but the stranger was the larger of the two and defendant was still lame from a recent automobile accident. Shortly thereafter defendant left the café and returned later. There is a conflict in the evidence as to whether Sandoval left and returned with defendant or remained at the café. Later in the evening defendant had another argument with the stranger, and one of the café employees observed that he had a gun, which he moved from one pocket to another. An employee asked defendant to leave, and he did. Another employee, Frances Mendes, asked the stranger, who was intoxicated, to go to a shack behind the café and sleep. While she was pointing out the way from a side door she observed defendant at the outside front corner of the building pointing a gun at them. The stranger proceeded to the shack, and defendant sat down at the outside front corner of the building. Frances Mendes then summoned Deputy Sheriff Ainger at his home nearby. Ainger deputized his son, and the two went in their automobile to the café where they arrived about 11:30 p. m. The deputy sheriff noticed four persons lounging near the front corner of the café when he arrived. He was met at the door by Frances who pointed out defendant and requested that he be searched because he had a gun. Defendant then started to retreat around the side of the building, and the deputy sheriff's son ran after him and shouted at him. In the course of the first six or eight seconds of his retreat defendant fired two shots in rapid succession. The second shot struck the deputy sheriff's son, inflicting a wound from which he subsequently died. Defendant was arrested the following morning when he was found hiding in a clump of trees in a dry slough. He put up no resistance at the time of his arrest, and the gun was found on the ground where he had been hiding.

Defendant testified that when he and Sandoval left the café, Sandoval drove them to their home in Colusa. Sandoval entered the house and defendant stayed in the car. They

then started back to Grimes, and on the way Sandoval thrust the gun on defendant over his protest telling him he would need it for his protection because they were going to kill him. During the second argument the stranger displayed a knife and indicated he intended to use it. Later when the deputy sheriff and his son drove up, Gonzales, who was near defendant outside the café, gave defendant a shove and addressed him in Spanish. Defendant retreated under the impression that the stranger had returned, and when he heard running and shouting behind him, fired two shots without aiming. He had no intention of killing or even hitting anyone and wished only to escape from what he feared was a murderous assault by the stranger.

On September 29th the district attorney filed an information charging defendant with murder. The next day the court appointed Ralph W. Rutledge and John D. McComish as counsel for defendant. On October 10th defendant was arraigned and pleaded not guilty and not guilty by reason of insanity, and the court set the trial for November 28th. On November 18th Thomas C. Perkins was retained by the Mexican Consul on behalf of defendant, and on November 23d he was substituted for the court-appointed counsel and at that time associated John D. McComish with him as counsel for the defense. On November 23d defendant moved for a change of venue under Penal Code, section 1033, and also for a continuance to allow additional time for Mr. Perkins to prepare for trial. The motion for a continuance was denied on that date, and on November 26th the motion for a change of venue and a renewal of the motion for a continuance were both denied. The plea of not guilty by reason of insanity was withdrawn. On November 27th Mr. Perkins informed the judge by telephone that he was ill and was prepared to present an affidavit of his physician that he should stay in bed for three days. The judge informed him that the case would go to trial the next day and that if he were not present the court would reappoint Mr. Rutledge to represent defendant. Mr. Perkins appeared the following day and filed the affidavit of the physician. He did not move for a continuance but stated that he wanted the affidavit to be on file in the event that he should become worse and request a continuance for that reason. No further motion for a continuance was made, however, and the trial proceeded. The jury returned a verdict of guilty of murder of the first degree without recommendation.

542

■ On his appeal defendant contends that the trial court erred in denying his motion for a change of venue. He urges the following facts as establishing that he could not secure a fair and impartial trial in Colusa County; that he was a foreign national charged with murdering a popular officer of a small community; that the decedent, his family, and the prosecuting attorneys were well known to, or friends of, a large fraction of the jury panel; and that the newspaper accounts of the homicide both stimulated and reflected a hostile and biased attitude against him in the county. The newspaper accounts, however, appear to be no different from the usual reporting of any homicide of this sort. The popularity of the decedent, the fact that the inhabitants are well known to each other in a small county, and the customary newspaper publicity, do not necessarily warrant the granting of a motion for change of venue. (*People* v. *Yeager,* 194 Cal. 452, 482-483 [229 P. 40]; *People* v. *Agnew,* 77 Cal.App.2d 748, 758-759 [176 P.2d 724]; *People* v. *Ford,* 25 Cal.App. 388, 394 [143 P. 1075].) Against defendant's motion the district attorney presented affidavits of the editors of the two local papers describing the attitude of the community. The record also shows that a jury was selected without undue difficulty and that defendant did not exhaust his peremptory challenges. The trial did not take place until approximately three months after the homicide. In view of these facts and the trial court's own knowledge of the atmosphere of the community, it cannot be said that the trial court erred in concluding that defendant could secure a fair and impartial trial in Colusa County. (*People* v. *Brite,* 9 Cal.2d 666, 689-690 [72 P.2d 122]; *People* v. *Hall,* 220 Cal. 166, 170 [30 P.2d 23]; *People* v. *Yeager, supra; People* v. *Agnew, supra; People* v. *Ford, supra.*)

■ Defendant contends that the trial court erred in denying his motions for continuances. The fact that Mr. Perkins was retained 10 days before the trial and had the assistance throughout of one of the appointed counsel who had almost two months to prepare, establishes, however, that the trial court did not abuse its discretion in denying a continuance to allow Mr. Perkins additional time to prepare. (*People* v. *Dorman,* 28 Cal.2d 846, 852 [172 P.2d 686].) ■ As to the request for a continuance because of illness, any objection was waived when Mr. Perkins appeared and disavowed any intent to move for a continuance for that reason at that time. Although he contends that a motion in court would have been a futile act in view of the trial judge's attitude communicated

to him over the telephone the day before, there was at no time any proper motion before the court for a continuance based on counsel's illness. (Pen. Code, § 1050.)

█ Defendant contends that the trial court erred in denying a motion to replace the court-appointed interpreter on the ground of incompetence. Defendant and three witnesses testified through the court-appointed interpreter. Defendant also had the assistance throughout the trial of interpreters from the Mexican Consulate. The record contains affidavits of defendant's interpreters that the court-appointed interpreter was incompetent. It was arranged at the trial that if defendant's interpreter disagreed with the court-appointed interpreter the questions should be asked and answered anew for purposes of correction. Defendant points out many instances in the record where corrections were made in this manner and the court interpreter admitted error. The competence of the interpreter is ordinarily for the trial court to determine. (*People* v. *Valencia,* 27 Cal.App. 407, 408 [150 P. 68]; *People* v. *Salas,* 2 Cal.App. 537, 539 [84 P. 295]; see 3 Wigmore on Evidence [3d ed.], § 811, p. 225.) Since the court interpreter and defendant's interpreter were generally in agreement and the affidavits set forth no errors that were not corrected in the course of the trial, the trial court was justified in concluding that the court-appointed interpreter was competent.

█ Defendant contends that the trial court erred in admitting in evidence the statement of Frances Mendes to Deputy Sheriff Ainger that defendant had a gun and she wanted him searched. This evidence was admitted to show that defendant had retreated, not because he thought the stranger had returned, but because of the conversation he heard between Frances and the deputy sheriff. Although defendant withdrew his objection when it was established that he was within earshot and made no objection when the same conversation was related by a second witness, he now contends that the statement was not admissible to show his response thereto because he did not understand English. There was evidence in the record, however, from which it could be inferred that defendant did have some understanding of English. It was therefore for the jury to determine whether he retreated because he understood the conversation or because he thought the stranger had returned. (*People* v. *Simmons,* 28 Cal.2d 699, 713 [172 P.2d 18].)

■ Defendant contends that the trial court erred in refusing the following instruction: "You are instructed that in this case the defendant is not only entitled to depend upon evidence which he may have offered on his own behalf, but he is entitled to the benefit of any and all evidence, or lack of evidence tending in any way to show his innocence, which may have been offered by the prosecution if there is any such evidence." The jury was instructed, however, to consider *all* the evidence in the case in reaching their verdict. Murder, its degrees, and included offenses were defined, and the jury was instructed as to intoxication, justifiable homicide, and self-defense. The burden of proof resting on the prosecution to prove every material allegation was emphasized. The principle embodied in defendant's proposed instruction was therefore adequately covered by the instructions that were given.

■ Defendant contends that the prosecuting attorney was guilty of misconduct in eliciting irrelevant testimony in one instance and in commenting on facts not in evidence during his argument. No motion to strike the irrelevant testimony was made, however, and defendant has not shown how he was prejudiced thereby. Many of the facts referred to by the prosecuting attorney could reasonably be inferred from the evidence (see *People* v. *Eggers*, 30 Cal.2d 676, 693 [185 P.2d 1]), and no request was made to the trial court to admonish the jury in regard to the others. The trial court, however, during the course of the trial and in its instructions, admonished the jury that they were to be governed solely by the evidence introduced in the case and not by statements made by counsel. We have concluded, therefore, that the record shows no prejudicial misconduct that would warrant a new trial. (See *People* v. *Sampsell*, 34 Cal.2d 757, 763-764 [214 P.2d 813] and cases there cited.)

■ Defendant contends that the evidence is insufficient to support a conviction of murder in the first degree. We agree with this contention. Under the provisions of Penal Code, section 189, the homicide in this case could be murder of the first degree only if it were a "willful, deliberate, and premeditated killing." The jury could have inferred that defendant shot at his pursuer thinking he was either the stranger or another. If they concluded that defendant knew his pursuer was not the stranger, they could only speculate on the question whether the shooting was, as the prosecuting attorney contended in his closing argument, in pursuance of

a plan to kill if necessary to avoid arrest. The whole incident occurred within six to eight seconds. There is no evidence that defendant had any reason to fear the police, or that the deputy sheriff and his son were in uniform so that defendant might have inferred they were officers. Thus, if the jury believed that defendant knew his pursuer was not the stranger, the evidence would sustain a conviction of no more than murder of the second degree. (Penal Code § 189; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Bender,* 27 Cal.2d 164, 179 [163 P.2d 8].)

There is no evidence bearing on the relationship of defendant to the stranger to support an inference that defendant formed a deliberate and premeditated intent to kill him. Defendant did not know him before the day of the homicide. Although defendant did have two arguments of an undetermind nature with him, there is no evidence that he made any verbal threats against him and his conduct was inconsistent with the existence of a deliberately formed intent to kill. He did not use the gun during the course of the arguments, and he left the café quietly when requested to do so. Although there is evidence that he pointed the gun at the stranger for a moment, he neither pursued him nor interfered with his departure. The situation had become quiescent by the time the officers arrived, and as noted above, there is nothing in the evidence of what happened in the next few seconds to show a deliberate and premeditated killing.

Respondent contends, however, that the evidence that defendant left the café to secure a gun is sufficient to support an inference that he had formed an intent to kill the stranger and armed himself to carry out his plan. Even if it is assumed, however, that such evidence would support an inference of premeditation, there is no evidence that he left the café to secure a gun. Defendant testified that he did not leave for that purpose but that the gun was forced upon him on the return trip from Colusa to Grimes. If the jury disbelieved defendant's testimony they would still be left with no evidence as to why defendant left the café or when or under what circumstances he became armed.

"Generally the determination of the degree of the crime is left to the discretion of the jury. [Citations.] But the jury's discretion is not absolute. Since the amendment of section 1181 of the Penal Code in 1927 trial courts and re-

viewing courts are authorized to modify the judgment and fix a lesser degree of the crime in those instances where on an appraisal of all the evidence there is found to be lacking any substantial evidence of the elements required to constitute the degree of the crime as fixed by the jury. . . .

"In determining whether the killing was accompanied by a deliberate and premeditated intention to take life such circumstances as the previous relations between defendant and the victim, the actions of the defendant before as well as at the time of the killing, and the means by which the homicide is accomplished, are important." (*People* v. *Tubby,* 34 Cal.2d 72, 76-78 [207 P.2d 51].) When such circumstances are considered in relation to the evidence in this case it is clear that the record is devoid of any substantial evidence that defendant had formed a wilful, deliberate, and premeditated intent to kill.

Defendant has filed in this court an application to have documentary evidence admitted and added to the record. Section 4¾ of article VI of the Constitution and section 956a of the Code of Civil Procedure provide for the admission of additional evidence in the appellate court only where trial by jury is not a matter of right or has been waived. Although it has been held that section 956a is only applicable in civil actions (*People* v. *Cowan,* 38 Cal.App.2d 144, 152-154 [100 P.2d 1079]), it is unnecessary to decide whether defendant's application would be proper if the trial had been before a judge sitting without a jury. Since a jury trial was not waived the application must be denied.

The order denying the motion for a new trial is affirmed. The judgment is modified by reducing the degree of the crime to murder of the second degree and as so modified the judgment is affirmed. The cause is remanded to the trial court with directions to sentence defendant to imprisonment for the term prescribed by law for murder of the second degree.

Gibson, C. J., Carter, J., and Schauer, J., concurred.

EDMONDS, J.—As I read the record, there is an abundance of substantial evidence to support the jury's implied finding of premeditation. Although this evidence would support a contrary conclusion, I cannot agree that, as a matter of law, it is an insufficient basis for the jury's implied finding that Mendes is guilty of a "willful, deliberate and premeditated killing."

Pedro Saucedo, who was the bartender in the La Moderna saloon in Grimes on the evening of the shooting, testified that Mendes came in sometime between 7:30 and 10 o'clock. Three men were with him. There were four persons in the barroom. Mendes commenced ". . . sort of knocking or shaking the bottles on the bar." Saucedo told him to refrain from doing so. Apparently, Mendes complied with this request.

Later, according to Saucedo, Mendes ". . . sort of got mad with other persons." Asked to be more specific, the witness replied: "I don't know what he did. I heard just arguments . . . they were talking loud . . . I don't know whether they did fight or not."

Frances Mendes, an employee at the La Moderna who is not related to defendant, testified that she was tending the bar with Saucedo at that time, and had served beer to Mendes and his companions. There was an argument between Mendes and a tall stranger. As Mrs. Mendes described the incident, ". . . well, they were playing at first, and they—they got sore at each other. They were joking, they were friendly; and then after a while they were mad, and I don't remember what happened." When she was asked whether the incident was limited to verbal exchanges or included a fight, she replied, "Well, a little fight, then we separated them and told Mr. Mendes to leave."

Enrique Sandoval, one of the companions of Mendes, testified that they entered the saloon about 7 o'clock in the evening. He and Mendes, with another man and the tall stranger, drank together at the bar. After Mendes consumed about seven beers, the two men quarreled.

According to the testimony of Mendes, after he and two companions entered the saloon, they and a tall stranger drank several beers. Mendes said that he "was talking to the bartender—bar maid—and then someone came and insulted me. . . ." This person, Mendes told the jury, "came near me and then started swearing at me and tell me lots of bad words . . . Then he came back to me again and insulted me again . . . Telling me of my mother. . . ." Such a reference, the interpreter explained, is a Mexican insult. Continuing his testimony, Mendes declared that the tall stranger ". . . struck me when I was sitting down on the bar." Then, as all of the witnesses agreed, Mendes and Sandoval left the saloon and drove away in the latter's car.

With Sandoval driving the car, the two men went to Colusa

and then returned to Grimes, a distance of about 30 miles. Mendes said that they went to their home in Colusa, where Sandoval procured a gun. "Early he didn't have anything," said Mendes, "but after he came out of the house he had a gun." As Mendes related the occurrences, he was afraid of returning to Grimes, but Sandoval gave him the gun and said, "Here. Defend yourself because they are going to kill you." Mendes explained that he had the gun in his hand when he reached Grimes, and at that time attempted to return the gun to Sandoval. The latter again said, "No, it is for your defense, because they are going to kill you and you haven't got anything."

Although he was frightened, said Mendes, he entered the saloon at Sandoval's insistence. The tall stranger was still there. Mendes ". . . went to one side because [he] was afraid." At that time, according to the testimony of Mendes, the tall stranger began to remove his shirt, and stated that he had a knife and ". . . he didn't want that knife just to bless the saints." Mendes explained this expression as meaning that the knife was to be used.

Saucedo testified that Mendes was showing a gun he had in his hand at about this time. According to Saucedo's description of the events, Mendes was changing the gun from one pocket to the other and from one hand to the other. At this point, Saucedo put Mendes out of the saloon. This was at approximately 11:30.

Mendes sat on the porch. The barmaid sent the tall stranger to a shack near the saloon where he could sleep. While she was talking to him through the side door in order to direct him to the shack, Mendes pointed his gun at them. As Mrs. Mendes described the scene, "Well, when I saw the gun was when I was talking to the boy through the side door, and telling him where the shack was; then Mr. Mendes [defendant] pointed it at us—pointed at us with a gun." This witness stated that she knew the object pointed at the stranger and herself was a gun, because ". . . I saw it shining; I knew it was a gun (indicating)."

Shortly thereafter and at the request of Saucedo, Frances Mendes went for the police. George H. Ainger, Sr., a deputy sheriff, and his son responded to her call. Mrs. Mendes told the officer that Mendes was armed and asked that he be searched. As Ainger started toward Mendes, the latter went around the corner of the saloon and began running. George Ainger, Jr., who was unarmed, shouted at Mendes to stop,

and started after him. According to the officer, although the headlights of his car were burning, the illumination on and about the saloon porch was insufficient for him to recognize Mendes' features. As the officer reached the corner, Mendes fired twice in quick succession. The second shot struck Ainger, Jr., and killed him. The father fired once at the fleeing Mendes and then his gun jammed. Mendes was found the next day in a culvert several miles away. The gun was lying nearby.

Upon this evidence, the jury was justified in determining that Mendes, while unarmed, was insulted by and fought with a tall stranger. Thereafter, Mendes drove 30 miles with his friend and returned to the saloon with a revolver. The quarrel was then renewed and Mendes displayed his gun. At one time he aimed the gun at the tall stranger and the barmaid, who was standing next to him. Soon thereafter, Mendes fired two shots at the son of the deputy sheriff who he thought, because of the poor illumination, was the tall stranger.

Certainly from this evidence the jury might infer that young Ainger was killed because of the premeditated plan of Mendes to kill the tall stranger. The departure from the saloon without a gun and the return with it alone would support such a conclusion. But even if this evidence were not believed by the jury, the testimony as to the quarrel and the subsequent display and aiming of the gun at the tall stranger justifies the implied finding of the jury that the crime was premeditated.

The facts of this case are quite similar to those in *People* v. *Walker,* 76 Cal.App.2d 10, 14 [172 P.2d 380]. There, in affirming the judgment, the court stated: "While the evidence discloses no enmity between appellant and deceased it reveals that the former's 'blood lust had been aroused' to the extent that he desired to take life. . . . From the success of his venture it was a fair deduction that his act was deliberate and malicious homicide. (*People* v. *Sainz,* 162 Cal. 242, 244 [121 P. 922].) If he aimed to shoot Alfred and by accident hit Vernal, or if he mistook Vernal for Alfred, in either event his murderous intent was by law transferred to the victim (*People* v. *Pivaroff,* 138 Cal.App. 625, 628 [33 P.2d 44]; *People* v. *Suesser,* 142 Cal. 354, 367 [75 P. 1093])."

In the present case, although ". . . the whole incident occurred within six to eight seconds," the killing was the culmination of events which transpired in the three hours after Mendes went to the saloon. During that time he armed him-

self and displayed his weapon several times during a long quarrel with the tall stranger. However, the elapsed time is not the determining aspect (*People* v. *Maughs,* 149 Cal. 253 [86 P. 187] ; *People* v. *Fowler,* 178 Cal. 657 [174 P. 892]). Rather it is of course a question as to whether the evidence shows a ''willful, deliberate, and premeditated killing.'' Although from the evidence as to Mendes' acts, the jury might have found lack of premeditation, it determined that he is guilty of murder in the first degree. That determination is beyond the reach of an appellate court.

For these reasons, I would affirm the judgment.

Shenk, J., and Spence, J., concurred.

The opinion was modified to read as above and respondent's petition for a rehearing was denied July 6, 1950. Shenk, J., Edmonds, J., and Spence, J., voted for a rehearing.