[S.F. No. 24226. June 18, 1981.]

ANTONIO MICHAEL MARTINEZ, Petitioner, v.
THE SUPERIOR COURT OF PLACER COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Blackmon, Wasserman & Blicker and Clyde M. Blackmon for Petitioner.

Quin Denvir, State Public Defender, as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Edmund D. McMurray and Willard F. Jones, Deputy Attorneys General, for Real Party in Interest.

OPINION

**TOBRINER, J.**—In this proceeding we must determine whether petitioner Antonio Martinez should be granted a change of venue for trial

on charges pending against him in Placer County. Denying the motion, the trial court ruled against the sought change of venue. Our independent evaluation of the record, however, discloses a reasonable likelihood that a fair and impartial trial cannot be conducted in Placer County. We explain, therefore, why we have concluded that the venue should be changed.

Petitioner Martinez is charged by information with one count of murder (Pen. Code, § 187), three counts of robbery (§ 211), and one count of attempted robbery (§§ 664, 211). The People set forth special circumstances on the murder count (former § 190.2, subd. (c)(3)(i)) and, with respect to the robbery counts, allege use of weapons under sections 12022 and 12022.5. The prosecution initially charged Allen Davis as a codefendant; his case was severed for separate trial in June 1979; he was acquitted on August 30, 1979.

On September 28, 1979, petitioner moved for change of venue for his trial, then scheduled for November 13, 1979, on grounds that, because of pretrial publicity concerning the charges against him, he could not obtain a fair and impartial trial in Placer County. After denial of the motion, Martinez filed a petition for writ of mandate seeking to compel the trial court to grant a change of venue. An alternative writ has issued and trial has been stayed pending resolution of this matter.

A pretrial writ of mandate is an appropriate remedy to compel a change of venue. (*Frazier v. Superior Court* (1971) 5 Cal.3d 287 [95 Cal.Rptr. 798, 486 P.2d 694]; *Fain v. Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23]; *Maine v. Superior Court* (1968) 68 Cal.2d 375, 378-379 [66 Cal.Rptr. 724, 438 P.2d 372].) On a pretrial writ, as on appeal from judgment of conviction, the appellate court must make an independent evaluation of the circumstances surrounding a defendant's claim for change of venue and must satisfy itself de novo that a fair trial is or was obtainable in the county of original venue. (*People v. Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240]; *People v. Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *Frazier v. Superior Court, supra*, 5 Cal.3d at p. 293; *People v. Tidwell* (1970) 3 Cal.3d 62, 69 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine v. Superior Court, supra*, 68 Cal.2d at p. 382.) The standard to guide the reviewing court finds expression in *Maine*: "'A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence

of such relief, a fair trial cannot be had.... A showing of actual prejudice shall not be required.'" (68 Cal.2d at p. 383.) The phrase "reasonable likelihood" denotes a lesser standard of proof than "more probable than not." (*Frazier, supra,* 5 Cal.3d at p. 294.) Further, when the issue is raised before trial, any doubt as to the necessity of removal to another county should be resolved in favor of a venue change. (*Fain, supra,* 2 Cal.3d at p. 54; *Maine, supra,* 68 Cal.2d at pp. 387-388; *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 875 [101 Cal.Rptr. 411].)

With these general principles in mind, we examine the record in this case and attempt to isolate the factors which, in *Maine* and the cases that followed, have been considered criteria of the potential for prejudice from pretrial publicity. Factors to be considered include the extent and kind of the publicity as well as the size of the community in which the crime occurred. The nature and gravity of the crime serves as an important factor. We also consider the standing of the victim and the accused in the community. (*Maine, supra,* 68 Cal.2d at p. 385; *Frazier, supra,* 5 Cal.3d at p. 293; *Fain, supra,* 2 Cal.3d at pp. 51-52.)

Our analysis convinces us that the controlling factors in the instant case which compel a change of venue are (1) the extensive publicity over a period of a year prior to the venue motion, especially the publicity attendant on the trial of the alleged accomplice Davis, (2) the size of Placer County, and (3) the nature of the crime, involving the gravest possible consequences to the accused. We find also significant, but less important and not controlling here, the status of the victim and the accused in the community.

1. *The nature and extent of publicity evidences community bias and poses a danger to a fair trial.*

The charges against petitioner stem from an attempted robbery of the Owl Club Bar in Roseville on the evening of July 14, 1978, and the robbery of the Onyx Club, also in Roseville, on the morning of July 15, 1978. During the Onyx Club robbery, George Robert Alves was shot and killed.

For more than a year before petitioner moved to change venue, three local newspapers (the Auburn Journal, Press-Tribune, and Sacramento

Bee) covered petitioner's pending trial.[1] Commencing with front page pictures of petitioner and Davis in chains shortly after their arrest, the press followed the legal maneuverings that attend capital cases and, in almost daily articles, followed the testimony and developments in the trial of codefendant Davis.

Petitioner submits 97 newspaper articles to support his motion for change of venue. The press gave substantial coverage to the fact that the accused forced the patrons to lie face down on the floor during the robbery and shot the victim at close range in the back, reportedly because the killer mistook him for a police officer.

Of the 13 articles which dealt directly with the death penalty aspects of the case, 10 mentioned the death penalty in the headlines; 3 articles dealt with the dismissal of the special circumstances against Davis and bore headlines indicating that petitioner was still charged with a capital offense. One headline, in the Auburn Journal, proclaimed "DEATH PENALTY OK IN ONYX KILLING," arguably implying that the law approves imposition of that penalty on the person who killed Alves.

The media also devoted extensive coverage to the proceedings involving codefendant Davis. The press reported the prosecutor's theory that the Onyx Club robbers were narcotic addicts seeking money to buy heroin. Davis defended by presenting an alibi and contending that the petitioner and Raul Hernandez, a prosecution witness testifying under a grant of immunity, robbed the Onyx Club.

Some of the articles contained information potentially prejudicial to an impartial determination of petitioner's guilt or innocence. In reporting on the prosecutor's opening statement in the Davis trial, the Press-Tribune said, "[p]rosecutors believe he [Martinez] killed Alves." When the trial court ruled that Davis could not be charged with special circumstances, the Auburn Journal reported that the allegation was dismissed "because he didn't fire the gun which killed George Robert Alves in a Roseville bar." In one article a deputy district attorney is quoted as saying: "We will amend the special circumstances allegation to fit our charges of Martinez being the gunman and Davis being the

---

[1]The three newspapers have a combined daily circulation in the county of 36,463, roughly equivalent to one-third of the county's population. Based upon calculations of the voting population and the newspaper circulation, at least one-half of the potential jurors in the county have been exposed to the press coverage of petitioner's case.

aider to and abettor to the murder." The Sacramento Bee headlined "MURDER WITNESS INVOKES FIFTH AMENDMENT," reporting that Hernandez had admitted being petitioner's crime partner in other robberies and that he helped dispose of the weapon used in the Onyx Club killing. The net effect of the coverage was to suggest to the persons who were potential jurors in the trial of his case the probability that petitioner was the actual killer.

Petitioner also directs our attention to the newspaper articles which report the conflicts which have surfaced in the community because of the prosecutor's inability to secure a conviction in the Davis and other cases. After noting the lack of staff in the district attorney's office, the chief of police stated: "The prosecution doesn't have the luxury of an outside defense attorney who can hire his own investigator." In the same article the sheriff and district attorney are quoted as deploring their inability to put all the evidence before the jury: "If the jury had been able to hear and see all the evidence we had, it probably would have voted differently." Petitioner urges that statements of this nature will have the effect of leading people to believe that the problems in the prosecution's cases resulted from the lack of staff and the exclusion of evidence because of technicalities and not from the defective proof which might have indicated a defendant's innocence.

The Attorney General contends, however, that the articles do not cast light on petitioner "in an inflammatory or sensational manner" nor evidence any form of hostility toward him. Even if true, these observations do not control. "A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility. [Citation.] When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt." (*Corona, supra*, 24 Cal.App.3d at p. 877.) "[I]t is significant here that in *Maine* press coverage was neither inflammatory nor particularly productive of overt hostility." (*Tidwell, supra*, 3 Cal.3d at p. 70.) Similarly, venue was changed in *Steffen* v. *Municipal Court* (1978) 80 Cal.App.3d 623 [145 Cal.Rptr. 782], in which defendants were charged with solicitation of an act of prostitution, although the coverage "has not been inflammatory or particularly hostile, nor has it, in any sense, involved petitioners by name." (*Id.*, at p. 626.)

Thus, the fact that we do not face here an extreme example of an inflammatory and hostile press, such as that described in *Frazier, supra*, 5 Cal.3d 287, or, more recently in *People v. Harris, supra*, 28 Cal.3d 935, does not negate the adverse effect of the publicity involving petitioner nor obviate our consideration of that factor in our ultimate resolution of the venue issue.

Indeed, the fact that the prosecution sought the death penalty gave the case pre-eminence in the media. The element of sensationalism, always present in reporting of events concerning a capital case, became all the more pronounced in the instant case by the "preview" of the events that unfolded in the trial of codefendant Davis. Much of the information presented to the public in the daily media coverage of the Davis trial, as outlined above, caused extreme prejudice to petitioner. "The goal of a fair trial in the locality of the crime is practically unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media." (*Corona, supra*, 24 Cal.App.3d at p. 878.) In this case, not only did the alleged crime partners point the finger at petitioner, but presumably knowledgeable officials also made statements indicating their belief in petitioner's guilt. We conclude, therefore, that the nature and extent of the publicity is a factor which in this case weighs in favor of a change of venue.

2. *Although not alone determinative, the size of the population of Placer County weighs in favor of a change of venue.*

To evaluate the impact of the press coverage we must also consider the size of the community from which the jury panel will be selected. In a small town, in contrast to a large metropolitan area, a major crime is likely to be embedded in the public consciousness with greater effect and for a longer time. (*Maine, supra*, 68 Cal.2d at p. 387.) Thus, when, despite extensive and even sensational coverage, a trial is scheduled in a populous urban area (*Harris, supra*, 28 Cal.3d at p. 949; *People v. Manson* (1976) 61 Cal.App.3d 102, 189 [132 Cal.Rptr. 265]) the courts have denied petitions for change of venue. On the other hand, when trial is scheduled in a small rural community, even though the publicity is not inflammatory and not hostile toward the defendant, the courts have granted such a change. (*Corona, supra*, 24 Cal.App.3d at p. 877.)

In *Fain, supra*, 2 Cal.3d at page 52, we determined that Stanislaus County, with a population of 184,600, was too small to dissipate the ef-

fects of extensive pretrial publicity. In *Frazier, supra*, 5 Cal.3d 287, we rendered the same finding with respect to Santa Cruz County which had a population of 123,700. And in *Steffen* v. *Municipal Court, supra*, 80 Cal.App.3d 623, the court ordered a change of venue from San Mateo County, the 11th most populous county in the state with almost 600,000 residents.

Placer County, with a population of 106,500, counts a lesser population than any of the counties described above; it is the 29th in population size of the 58 counties of California. While size of community does not in itself resolve the venue issue, it clearly composes an important factor which in the present case weighs toward the necessity of a change of venue.

### 3. *The nature and gravity of the offense, capital murder, is a primary consideration in requiring a change of venue.*

The peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its "nature"; the term "gravity" of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict. The Attorney General contends this case does not qualify for either category; he characterizes petitioner as a person "of no particular status," accused of murder in a "nondescript" Roseville bar holdup. This characterization ignores publicity given to the fact that the victim was shot in the back, while lying on the floor, because the killer mistakenly thought him to be a police officer. Indeed, one newspaper article referred to the tavern as the "scene of a cold-blooded killing." Petitioner suggests that the coverage had the effect of portraying him and Davis as "cold-blooded" killers. Another potential effect of coverage stressing the shooting in the back of one believed to be a policeman is to create the impression of an "execution-style" murder of the worst sort.

The Attorney General argues that the nature of the charged offense does not compare to the bizarre, heinous, and often multiple, killings for which in other cases change of venue has been granted. Under the mandate of *Maine*, however, we must approach each case on an individual basis; each factor is worthy of consideration even if "isolated and alone" it would not compel a change of venue. (68 Cal.2d at p. 388.)

The seriousness of the charged crime stands out clearly. Murder is a crime of utmost gravity; inasmuch as the state is seeking the death penalty, it is a crime of the gravest consequences to petitioner. *Because* it carries such grave consequences, a death penalty case inherently attracts press coverage; in such a case the factor of gravity must weigh heavily in a determination regarding the change of venue.

The Attorney General intimates that a change of venue in the instant case would require that venue be changed in every murder case. A significant circumstance that distinguishes petitioner's case from other murder cases, however, lies in the publicity which attended the trial of his codefendant, including police statements that the orders of the court in that case prevented the prosecution from presenting its whole case to the jury. The press reported the fact that codefendant Davis based his defense on alibi and claimed that the *petitioner* and Hernandez committed the robbery. Hernandez likewise pointed the finger at petitioner and, until Hernandez refused to testify further, his testimony received widespread publicity.

In *Fain, supra*, 2 Cal.3d 46, this court discussed the potential for prejudice fomented by a second trial; in that case, a prosecution for murder and other crimes, we granted a change of venue prior to retrial of the penalty phase. Although guilt was no longer in issue, the issue of life or death remained, and an impartial jury was equally, if not more, crucial at that stage of the proceedings. We concluded that, because the community had already been exposed to massive publicity in the trial, appeal, and reversal of penalty, "it would be difficult to find many local residents who have not been influenced by it in some degree." (*Id.*, at p. 52.)

The State Public Defender, appearing as amicus, contends that the difference between death penalty cases and those incurring lesser punishments presents a point so significant that a special rule should apply. He proposes that in any capital case in which there has been extensive publicity, a presumption should arise in favor of a requested venue change. "A rebuttable presumption of this nature would give proper weight to the fact that 'death is different,' as is the role of the jury in a capital case, yet allow the prosecution the opportunity to shoulder the burden of showing that a change of venue is unnecessary to protect the defendant's right to a fair trial."

We see no need at this time for so drastic a change in the procedural rules for change of venue, and we formulate no special rules for capital cases. First, the matter is more appropriately directed to the Legislature. Second, the existing rule that all doubts should be resolved in favor of a change of venue when ruling on a pretrial motion for change of venue provides both the trial and the appellate court with sufficient flexibility, after consideration of all the evidence, to insure a fair trial in any death penalty case that has been given extensive publicity.

4. ■ *The status of the victim and the accused in the community are significant but not controlling factors in assessing the necessity for change of venue.*

The victim's status in the community counts as a factor in assessing the risks of prejudice arising from a trial in the community. (*Maine, supra*, 68 Cal.2d at p. 385.) In some cases, we have noted that the victim was well known or well liked, or both, in the community, in contrast to the fact the defendant was a stranger to the community. (*Maine, supra*, 68 Cal.2d at p. 385 ["popular teenage couple"]; *Fain, supra*, 2 Cal.3d at p. 9 ["popular athlete"]; *Frazier, supra*, 5 Cal.3d 287 ["prominent surgeon and family"].) On the other hand, the victims in *Corona, supra*, were "anonymous transients" (24 Cal.App.3d at p. 877). ■ Although the trial court correctly stated that the victim was "no public figure," his status nonetheless appears to be significant. At the time of the murder, he was employed as a brakeman for the largest single employer in Roseville, Southern Pacific Railroad; virtually every newspaper article described him as a Southern Pacific brakeman. The victim's prominence in the public eye thus derives from the status of his employer, and that factor undoubtedly engendered community sympathy.

On the other hand, the press described petitioner in terms unlikely to evoke the sympathy or concern of the community. The newspapers repeatedly referred to the fact that when arrested petitioner had been confined in the state rehabilitation center for drug abuse because of parole violation. The district attorney's opening statement in the Davis trial, which was widely reported, claimed that a conspiracy to obtain funds for buying heroin set the scene for the robbery and murder. A witness testifying for the prosecution under immunity reportedly also stated that defendants had planned the robbery in order to obtain money to buy heroin. Petitioner, a member of a minority group and an

alleged heroin addict, "friendless in the community," represents exactly the type of defendant whom pretrial publicity can most effectively prejudice. (*Maine, supra*, 68 Cal.2d at p. 388.)

### 5. *Conclusion.*

Based upon the record and our evaluation of it in terms of the factors outlined above, we conclude that there is a reasonable likelihood that petitioner will not receive a fair and impartial trial in Placer County. No one factor controls our determination that a change of venue is appropriate here; rather we weigh all of the factors and, mindful of our duty, resolve all doubts in favor of petitioner.

The publicity, although not as sensational and inflammatory as in some cases in which venue has been changed, did not abate for any period in the year prior to the scheduled trial. It was especially persistent and pervasive during the Davis trial, at which time the media reported testimony and statements which painted petitioner as the killer, tending to create a belief in his guilt. Further, the publicity pervaded a community of a size which undoubtedly experiences major crimes less frequently than does an urban community. The publicity therefore works a greater impact and, we can assume, remains the focus of attention and concern for a longer period of time than in a larger community. Here the press described the murder as a "cold-blooded" killing, and its perpetrator as an indiscriminate "cop" killer. Such characterizations can easily become embedded in the consciousness of the community, especially a small one.

In addition, the situation is exacerbated by the status of petitioner, who is a heroin addict. Finally, but most significant in our view, is the gravity of the crime that is charged and its consequences to petitioner. We believe that, when a defendant's life is at stake, the rule that all doubts be resolved in favor of venue change, takes on particular significance. Neither an accused whose life hangs in balance nor the authorities charged with enforcing and administering the law should be required to face the possibility of a second trial when, as here, we face acute dangers to an impartial trial and when we can avoid them by the simple expedient of a change of venue.

Let a peremptory writ of mandate issue directing the Superior Court of Placer County to grant the motion for change of venue, hold a hear-

ing to determine a place where a fair and impartial trial can be had, and transfer the cause to that place.

Bird, C. J., Newman, J., Rattigan, J.,* and Hanson (P. D.), J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent, believing that Placer County can afford a fair trial to petitioner.

Generally, a change of venue is granted when the defendant demonstrates a reasonable likelihood that in the absence of such relief, such an impartial trial cannot be had. (*People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) It is our duty to make an independent evaluation of the record and to satisfy ourselves de novo that the defendant can obtain a fair and impartial trial, considering the nature and gravity of the offense, the size of the community, the status of the defendant in the community, the popularity and prominence of the victim, and the nature and extent of the news coverage. (*People* v. *Salas* (1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].) Considering carefully all of these pertinent factors, I conclude that petitioner has failed to establish a reasonable likelihood that he will not be able to obtain an unbiased jury in Placer County.

The charged homicide was, allegedly, a drug-related shooting incident to a robbery at a bar. Although murder is a crime of the utmost gravity, this particular offense was neither sensational in nature nor did it arouse the same sense of community shock or indignation generally associated with cases in which change of venue has been granted. (See, e.g., *Frazier* v. *Superior Court, supra*, 5 Cal.3d 287; *People* v. *Tidwell* (1970) 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court, supra*, 68 Cal.2d 375; *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872 [101 Cal.Rptr. 411] [involving bizarre, sensational, and multiple victim murder cases].) It differed little from the all too numerous killings routinely occurring in California, 2,941 in 1979. (Cal. Dept. of Justice, Crim. Justice Profile (1979) p. 22.)

---

*Assigned by the Chairperson of the Judicial Council.

Secondly, Placer County is neither so small nor unsophisticated as to render unlikely the selection of an unprejudiced jury from its populace. Connected by California's major freeways, this highly mobile community stretches from the Sacramento metropolitan area (population approaching 1 million) to the Nevada state line. It is served by numerous television and radio stations, and several newspapers. With a population in excess of 109,000, Placer County is the home of industry, agriculture, and popular resort areas. Many of its people, while living in Placer County, work in the Capital of California, commuting daily. Its industries include electronics, a major railroad, fruit, lumber product manufacturers and resort activities. Its people are neither parochial nor xenophobic but both informed and representative. Far from being remote or isolated, it is traversed by U.S. Highway 80, one of the nation's busiest transcontinental highways. It may be accurately described as very much in the mainstream of modern California life.

There are no particular facets of either the defendant or victim which are likely to generate community antipathy towards the defendant or sympathy towards the victim. The defendant's status as a Mexican-American does not make him the object of any community hatred nor is he a member of any unpopular subculture. (Cf. *Frazier, supra*, at p. 295.) Placer County is a community of many ethnic groups, including Japanese, Chinese, blacks, American Indians, and Filipinos. I find significance in the fact that petitioner's codefendant, who was acquitted by a panel of Placer County jurors, was of Indian and Mexican descent, and in the absence of any showing of anti-Hispanic prejudice, there is no reason to believe that petitioner's minority status would prohibit his receiving a fair trial in Placer County. Additionally, as in *People v. Hathcock* (1973) 8 Cal.3d 599, 620 [105 Cal.Rptr. 540, 504 P.2d 476], in which we upheld denial of a change of venue, petitioner is no stranger or newcomer to the county and thus no additional prejudice is engendered.

The victim, on the other hand, was a stranger, a nonresident transient worker with no particular prominence in Placer County. His fate drew no particular expressions of broad public sympathy or community antipathy towards petitioner, in marked contrast to the victims in *Maine, Frazier* or *Tidwell*. For example, in *Maine* the victims were described as "prominent" and "a popular teenage couple from respected families in the area." (68 Cal.2d at pp. 388, 385); in *Frazier*, the victims were "prominent local citizens" (5 Cal.3d at p. 293); in *Tidwell* the victims were described as "well known members of the community," and it was

noted that the husband was a member of one of the oldest families in the valley and the brother-in-law of the sheriff, while his wife worked in a local drugstore and was known to many members of the community (3 Cal.3d at p. 65). In the case before us, as in other cases in which a change of venue has been found unnecessary, there was nothing about the victim that was likely to engender marked community feeling for the victim or against his accused assailants. (*Hathcock, supra*, at p. 620; *People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 304 [107 Cal. Rptr. 289, 508 P.2d 289].)

The majority stresses that the victim was employed as a Southern Pacific Railroad Company brakeman, noting that the railroad is the largest employer in Roseville. However, jurors will be summoned from throughout the entire county's population, of which Southern Pacific employs less than 2 percent. It is hardly likely that the county would see this case as the murder of "one of us." In my view, any sharpened loyalties or sympathy generated by the victim's employment may be appropriately identified and challenged on voir dire.

Finally, the pretrial publicity in this case fails to disclose that petitioner will be unable to obtain a fair and impartial trial. The news articles and releases were no different in degree or intensity than the usual reporting of any homicide of this type. (*People* v. *Carter* (1961) 56 Cal.2d 549, 572 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *Mendes* (1950) 35 Cal.2d 537, 542 [219 P.2d 1].) *Maine* focused primarily upon "prejudicial newspaper publicity which either caused or reflected widespread hostility to the defendant in the community," suggesting that in determining whether a reasonable likelihood of prejudice exists in a particular case, the court must consider the "extent of the hostility engendered toward a defendant." (*Maine, supra*, at pp. 382, 388.)

As acknowledged by the majority, the extent and nature of the news coverage was neither highly sensational nor inflammatory. The absence of any hostility in the press accounts before us stands in sharp contrast with the adverse publicity and public sentiments expressed in the *Corona* and *Frazier* cases in which changes of venue were ordered.

Many of the news articles emphasized by petitioner involve totally unrelated cases, and others only vaguely refer to the charged offense before us. Those that report on petitioner's case are, for the most part, accurate factual accounts of the preliminary proceedings which would not attract unusual interest in this case. Only one article describes the

bar as the "scene of a cold-blooded killing." In my view, any potentially prejudicial impact of this one article is hardly determinative. Similarly, the fact that the case is one which may invoke the death penalty does not, standing alone, constitute sufficient reason for a change of venue. Several articles describing the district attorney's lack of an adequate budget and staffing, have, of course, statewide implications and any remote influence these facts might have upon prospective jurors would exist in any venue in the state.

As noted, petitioner's codefendant was tried in Placer County, and acquitted with an alibi defense. The pretrial publicity in that case presented no difficulty in the selection of impartial jurors. These jurors demonstrated no difficulty overcoming any prejudice arising from the "execution-type" murder charged against a minority defendant. Petitioner has also asserted an alibi defense, and the fact that his codefendant was acquitted and pointed the finger at petitioner does not, in my view, itself constitute such additional pretrial prejudice as would outweigh the demonstrated impartiality of Placer County jurors in acquitting that codefendant.

I also find significance in the fact that nearly three years have passed since the offense, and it is reasonable to believe that any pretrial publicity will have subsided by the time of petitioner's trial. It is a sad fact that in the interim period many other homicides have been committed. In this connection, the Placer County District Attorney's office conducted a study of potential jurors (see *People* v. *Martinez* (1978) 82 Cal.App.3d 1 [147 Cal.Rptr. 208]), which study concluded that 89 percent of those interviewed failed to recognize the name of the case. Over half of those failed to recall having either read or heard about the case when it was described to them; less than 5 percent had formed any opinion of guilt or innocence; and 85 percent believed they could decide the case solely on evidence presented in the courtroom.

I thus conclude on the record before us that it is probable that petitioner would be able on voir dire to select a panel of unbiased jurors from prospective jurors drawn in Placer County.

In *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], we adopted a special procedure for capital cases (individualized voir dire) to achieve the very goal we seek to advance here—a fair and impartial jury. The assertions of the majority as to the potential prejudice of pretrial publicity in this particular case are, at

this point, purely speculative, properly tested on voir dire. If the trial court on voir dire becomes persuaded that an impartial jury cannot be obtained a motion for change of venue can then be entertained and granted.

The record before us reflects that the charged offense was not so spectacular or bizarre as to have aroused the attention of the community; the defendant is relatively obscure; the victim lacked prominence; the community from which the jury will be drawn is of average size; the pretrial publicity was neither sensational nor inflammatory; and there has been a very substantial time lapse. These factors in combination persuade me that the motion for change of venue should be denied at this point. The record does not suggest any reasonable likelihood that Placer County cannot give defendant a trial that is as impartial and fair as any trial that he would receive in any other county in the state. I would retain the cause in Placer County until that inability became reasonably demonstrable.

Mosk, J., concurred.

The petition of real party in interest for a rehearing was denied July 15, 1981. Rattigan, J.,* and Hanson (P. D.), J.,* participated therein. Mosk, J., and Richardson, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.