[Crim. No. 39605. Second Dist., Div. One. Feb. 17, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY EUGENE BOYCE, Defendant and Appellant.

COUNSEL

Walter L. Gordon, Jr., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, J.—A jury found defendant guilty of kidnaping for purpose of robbery (Belas) (count I), robbery (Belas) (count II), robbery (Kratzer) (count III), attempted robbery (Barron) (count IV), first degree burglary (Barron) (count V), robbery (Binder) (count VI), first degree burglary (Binder) (count VII), robbery (Allen) (count VIII), first degree burglary (Allen) (count IX), robbery (S.) (count X), forcible rape (S.) (count XI), forcible oral copulation (S.) (count XII) and taking an automobile without consent of the owner (Allen) (count XIV), and the deadly weapon use allegations in counts IV through XII to be true. Defendant admitted the allegations that he had sustained two prior felony convictions (first degree robbery (Oct. 1969); second degree murder (Jan. 19, 1971)). He appeals from the judgment.

On October 31, 1978, Louis Belas left a savings and loan office with $1,000 cash; as he got into his car defendant robbed him of the cash and his diamond ring, then drove Belas' car out into the street; he told Belas that he had to raise $5,000 or he would never see his wife again; Belas said he did not have $5,000 but a certain woman owed him $195; defendant drove him in Belas' car to her home where she gave Belas a check for $195, then drove Belas to another savings and loan office; defendant stood behind Belas while he cashed the check. Ms. Lee, an employee of the savings and loan, knew Belas and saw defendant. Defendant drove Belas into an alley, abandoned Belas' car and fled.

On June 19, 1979, about 9:30 p.m. defendant forced open the bathroom window at the home of Mr. and Mrs. Barron, 80 and 77 years old respectively; holding a knife against Barron, defendant beat him about the head and face with his fist, threw him on the floor and demanded money; as Mrs. Barron screamed for help defendant ran through the

front door slashing the screen with the knife. Mrs. Barron's purse was missing. Next door defendant removed the screen in the kitchen of Mrs. Binder, 79 years old, threatened her with a knife and robbed her of two rings and cash. On July 5, 1979, defendant stood in a savings and loan office and watched Mr. Kratzer, age 80, cash two checks and put $373 in his pocket; when Kratzer left, defendant followed him in his car to his apartment where he assaulted and robbed him. Ms. Lee, who recognized defendant as the man she had seen with Belas, wrote down the license number of defendant's car.

In the evening of January 8, 1980, S. was visiting her friend Allen; defendant gained entrance through the kitchen and holding a knife against him hit Allen in the back of the head several times, cut the drapery and telephone cords, bound his hands and feet and robbed him. Holding the knife against her throat defendant robbed S. of her cash and a necklace, then forced S. into the bedroom, hit her on the back of the head, ransacked the dresser drawers, forced her to undress, bit her nose causing it to bleed and swell, forced her to orally copulate him, then raped her. Defendant fled in Allen's Toyota.

Shortly after midnight police went to defendant's apartment; he gave the officers false identification and tried to flee while being interviewed; various items belonging to S. and Allen including the keys to the Toyota were found in his apartment, and Allen's Toyota was parked nearby.

## DEFENSE

Defendant testified he went to the savings and loan office where his girl friend worked and she and he had an account; upon leaving the garage Mr. Belas ran into his car, and their return to the bank and visit to the lady who gave Belas the check were to raise money to pay him (defendant) for the damage. He denied robbing Binder and Barron and being in their apartments and robbing Kratzer. He testified S. was a prostitute, and picked her up and took her home at her request; later he took her to a friend, then moved her; S. told him Allen was a "trick" and dealt in cocaine and she would go over there and leave the door open for him; he did not go, and she was mad at him and said she was going to take it out on him. He denied raping S. or forcing her to orally copulate him; she received her injuries from a beating by two girls at his friend's house.

REBUTTAL

Employees of the savings and loan office testified that neither defendant nor his girl friend had an account there and that no one by the name of his girl friend was or had been employed there.

I

MOTION FOR CONTINUANCE AND MOTION FOR CHANGE OF VENUE

Louis Belas testified for the prosecution at the preliminary hearing and had been subpoenaed to testify at defendant's trial. About two weeks before trial Belas, who had a heart condition, and his wife were missing from their home under unusual circumstances—the door was open, a set of keys was in the lock, the lights were on, the bathtub was full, the television was on, and in his house were Belas' dentures, heart medicine and wallet, his wife's purse and the subpoena. The Belas' car was also missing but the next day it was found abandoned a few miles away. Thus prior to trial, publicity appeared in newspapers and on radio and television in Los Angeles about the disappearance of Belas, and became the subject of voir dire examination of each juror. During jury selection defendant moved for a continuance or change of venue. The court took the motions under submission.

Voir dire examination of each prospective juror individually was had in chambers by the judge, prosecutor and defense counsel. Each was asked whether he was aware of the disappearance of Belas or his connection with the case. All but one of the jurors ultimately selected to serve on the jury said they had heard of the disappearance, but most of them did not know Belas by name or realize he was to be a witness at trial. The court admonished the jurors that defendant was not charged with or accused in connection with the disappearance of Belas and they were not to draw any conclusions against defendant or harbor prejudice against him because Belas was missing. All of the jurors in essence stated that they would not be prejudiced against defendant by virtue of the disappearance of Belas and would not be influenced in reaching their verdict because of the disappearance. Nothing in their responses indicated that because they knew of the publicity they were prejudiced against defendant or had formed any opinion as to his guilt or could not act as impartial jurors. We assume the responses of the jurors to be

true. (*People v. Preston* (1973) 9 Cal.3d 308, 313 [107 Cal.Rptr. 300, 508 P.2d 300].)

Since Belas' disappearance there has been an ongoing police investigation in that matter, and defense counsel advised the court that several defense witnesses had been questioned by police about it and they told him that they did not want to testify for defendant at his trial. In an effort to solve Belas' disappearance the police had contacted many persons including some potential defense witnesses; the court pointed out that police had an obligation to conduct a thorough, complete and vigorous investigation of the disappearance, and suggested that defense counsel furnish it with a list of potential defense witnesses, the names on which it would not disclose, so that it could question police officers to determine the nature of the police contacts. Defense counsel did so and the court held an *in camera* hearing outside the presence of defense counsel and defendant to determine what police contacts had been made. A second *in camera* hearing was had in which only the court, defendant and defense counsel were present. It concerned problems some of the defense witnesses allegedly were having.

The trial court denied change of venue and, discussing its opportunity to observe the jurors "close up" during voir dire,[1] said: "So, I believe you have a fair jury here and a jury that can honestly try the case and will put aside any feelings." In denying continuance the court felt that the passage of time would make no difference and defendant would receive a fair trial, the delay would significantly prejudice the ability of the prosecution to secure attendance of witnesses for trial because of the fear factor and defendant too, well could be prejudiced by a delay. ▮ Appellant cites as error the court's denial of these motions claiming he was denied a fair and impartial trial because (1) the jurors were aware of the publicity of Belas' disappearance, (2) in their zeal to solve the disappearance the police had extensive contact with potential defense witnesses, and (3) after jury deliberations began there was a rash of media publicity about an imminent break in the Belas case.

▮ A continuance or change of venue must be granted when defendant shows there is a reasonable likelihood that in the absence of such

---

[1] The court noted it had the opportunity to look at "these jurors close up" in chambers and observed their reactions, body language and manner of response, and was satisfied they were being honest in their responses and were telling the truth. Each juror was questioned between 15 and 20 minutes and the court saw nothing "in these 12 people that would lead me to conclude that they can't give this man a fair trial, ..."

relief a fair and impartial trial cannot be had. (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) In determining whether defendant received a fair and impartial trial under the "reasonable likelihood" standard, we independently examine the record on a de novo basis (*People* v. *Harris, supra,* 28 Cal.3d 935, 948; *People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]) and consider these factors: the nature and gravity of the offense, nature and extent of the news coverage, size of the community, status of the defendant in the community and popularity and prominence of the victim (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502]; *People* v. *Harris, supra,* 28 Cal.3d 935, 948). ▪ We conclude that neither in the trial court nor here has defendant established a reasonable likelihood that he could not obtain a fair and impartial trial in Los Angeles County.

No news article relative to Belas' disappearance was before the trial court and none is before us; nor does the record disclose the exact content of any of the media accounts.[2] However, nothing indicates the publicity about Belas' disappearance contained anything inflammatory about defendant or his case or that the news stories were anything other than entirely factual. Nor do we know the extent of the publicity or frequency with which it appeared in the media. Kidnaping for the purpose of robbery and robbery are grave offenses and the punishment imposed on defendant was life imprisonment with possibility of parole, but here nothing about either one was of a sensational nature or such as to arouse shock or public indignation. The disappearance of Belas and his wife was under unusual circumstances and the media publicity focused primarily upon the mystery of the disappearance without regard for any connection with defendant's case or defendant. Of the 58 California counties Los Angeles County is largest in population. Neither Belas nor defendant was known in the community at large. None of the foregoing factors weigh in favor of a change of venue or even a continuance in this case. Finally, voir dire examination of the jurors demonstrates that the pretrial publicity in no manner had any effect of denying defendant

---

[2]Defense counsel did tell the court on argument on the motion that on television there was a story that the Belases had been gone for two weeks, "no word, nothing, but did not mention this trial, did not mention Mr. Boyce, but merely the fact that they went over the fact of how they found the house and no scintilla of evidence of where they were." The court countered that there had been no newsmen "hanging around" the court, and the fact of the trial proceedings or that a trial is going on had not come out in the paper.

his right to a fair and impartial jury. (*People* v. *Harris, supra*, 28 Cal.3d 935, 950.)

The trial court revealed that the *in camera* hearings[3] disclosed that in investigating Belas' disappearance the police had contacted some of the defense witnesses whose names appear on defense counsel's list, these contacts were both necessary and appropriate, and none of the police contacts was for the purpose of intimidating any witness and there would be no such intimidation. The court ruled that the police contacts had not interfered with defendant's ability to obtain a fair trial.[4] Appellant does not allege much less show that any defense witness was prevented from testifying or appearing or that any such witness gave testimony unfavorable to him because he had been contacted by police with regard to Belas' disappearance.

Shortly before the jury commenced deliberations, the court advised counsel it had heard "there was a bunch of media" the night before about the Belases. There was hearsay that television crews were going to the Wilshire police station on a late breakthrough in the Belas case, and defense counsel advised that the night before, he heard news releases on two radio stations that police were watching a man, they believed the Belases were dead, the Belases were to have been witnesses in a case involving defendant, a convicted murderer, and police expected an imminent breakthrough. The prosecutor said the news releases had not come from the district attorney's office, and the investigating officer in the Belas case had no knowledge of them or of a purported breakthrough. The jurors commenced deliberations but later that day the court ordered them sequestered to forestall the possibility of expo-

---

[3]The record of each hearing was ordered sealed. The Attorney General represents that the sealed record of the two *in camera* hearings is before us by augmentation of the record. However, it appears that the order of augmentation provided that only one sealed transcript be made a part of the appellate record, and we have read that transcript. Appellant did not request augmentation of the record.

[4]The court stated: "I did have the [*in camera*] hearing and the results of that hearing was [*sic*] that there had been some police contact with some of the witnesses on your [defense counsel] list. I won't say who, but I will make your list part of the sealed record in this case so that will be clear who you gave me that was on your list and who had been contacted, and I find based upon what was revealed to me that those contacts were necessary and appropriate, and I was assured that none of the contacts was for the purpose of intimidating any witness, and that the police assured me there would be no such intimidation, and I believe though based upon what I have been given so far, it hadn't interfered with defendant's ability to get a fair trial."

sure to any publicity. Appellant has not established and does not allege that any of the jurors knew of or heard any of the foregoing releases. Further, the jurors had been admonished on three occasions that they were not to read newspaper articles or listen to radio or television broadcasts concerning this or any other criminal case. We presume the jurors obeyed these instructions. (*People* v. *Campbell* (1976) 63 Cal. App.3d 599, 612 [133 Cal.Rptr. 815].)

On the record before us and our evaluation of it in terms of the factors considered, we conclude that there was not a reasonable likelihood that appellant did not receive a fair and impartial trial in Los Angeles County. Judge David Rothman who presided was meticulous in his examination of and admonishments to the jurors and in his conduct of the trial. It was he who suggested the *in camera* hearings to be sure that defense witnesses were not being discouraged by police from testifying. He was careful in his assessment of the Belas publicity, the police investigation of Belas' disappearance and the effect of the publicity on the jurors, and did all he could to assure that defendant would have a fair and impartial trial. It was his opinion after hearing and observing the jurors that defendant could obtain a fair and impartial trial, and the record of the entire trial supports this opinion.

## II

### CONSECUTIVE SENTENCES

Defendant was sentenced to life imprisonment with possibility of parole for kidnaping for purpose of robbery on count I and to four years on the Belas robbery on count II, the sentences to run concurrently; on the remaining 11 counts he was sentenced to a total of 33 years, the life term and the 33-year term to run consecutively, the life term to commence upon conclusion of his service of the 33-year term. ■ Appellant contends that section 669, Penal Code[5] prohibited the imposition of consecutive sentences on a life sentence.

Had defendant committed all of the crimes prior to January 1, 1979, the 33-year term of imprisonment would have had to run concurrently

---

[5]Section 669 was amended to allow consecutive sentences following a life sentence; the amendment became effective January 1, 1979.

with the life sentence imposed on the kidnaping count. (See *People* v. *Burnett* (1980) 111 Cal.App.3d 661, 670 [168 Cal.Rptr. 833].) The Belas kidnaping and robbery were committed on October 31, 1978, and the sentences thereon properly were ordered to run concurrently; but the other 11 crimes were committed subsequent to January 1, 1979. Thus under the amendment it was proper for the trial court to order that the 33-year term run consecutively to defendant's term of life imprisonment. This does not constitute unconstitutional ex post facto punishment because the sentence imposed on the kidnaping was in no way increased or enhanced by virtue of the consecutive 33-year sentence imposed only for crimes committed after January 1, 1979.

III

CONSECUTIVE SENTENCES ON COUNTS X, XI AND XII

The 33-year term included consecutive prison sentences for offenses against S.—robbery (count X) and the two sex offenses (counts XI and XII). ▮ Appellant contends that all three were part of a single transaction and incident to the same objective—achieving sexual gratification—thus he was improperly subjected to multiple punishment in contravention of section 654, Penal Code. Without question the robbery of S. was a separate and distinct offense, and on the authority of *People* v. *Perez* (1979) 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63, 3 A.L.R.4th 339] we reject appellant's claim as to the sex offenses. Factually *Perez* is not unlike the instant case; therein all offenses (robbery, kidnaping, theft, sex offenses) were against the same victim occurring within a one and one-half hour period. The trial court stayed the sentences on sodomy and oral copulation finding under section 654 that defendant's sole interest and objective was to obtain sexual gratification. On the People's appeal the Supreme Court rejected the argument here made by appellant saying: "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act. We therefore decline to extend the single intent and objective test of section 654 beyond its purpose to preclude punishment for each such act. [Citations.]" (P. 553.) The court held there was no basis for applying section 654, "None of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental to the commission of any other. We therefore conclude that section 654 does not preclude punishment for each of the sex offenses committed by defendant." (Pp. 553-554.)

The judgment is affirmed.

Spencer, P. J., and Dalsimer, J., concurred.

A petition for a rehearing was denied March 11, 1982, and appellant's petition for a hearing by the Supreme Court was denied April 15, 1982.