Filed 6/9/15  P. v. Patterson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER HARVELL PATTERSON,<br><br>    Defendant and Appellant. | F068508<br><br>(Super. Ct. No. BF143850A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Christopher Harvell Patterson (defendant) stands convicted, following a jury trial, of first degree murder during the commission of a robbery (Pen. Code,[1] §§ 187, subd. (a), 189, 190.2, subd. (a)(17); count 1), robbery with the personal infliction of great bodily injury (§§ 212.5, subd. (c), 12022.7, subd. (a); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).[2] Following a bifurcated court trial, he was found to have served a prior prison term. (§ 667.5, subd. (b).) The People not having sought the death penalty, defendant was sentenced to an unstayed term of life in prison without the possibility of parole plus four years, and ordered to pay restitution plus various fees, fines, and assessments.

We conclude the trial court did not err by denying defendant's motion for a change of venue. As defendant contends and the Attorney General concedes, however, the sentence imposed on count 3 should have been stayed pursuant to section 654. We will modify the judgment accordingly and affirm.

## FACTS

The facts of the crimes are largely irrelevant to the issues before us. Briefly stated, on August 19, 2012, defendant, a member of the Eastside Crips criminal street gang, was seated on a planter just outside a grocery store when 71-year-old Guadalupe Ramos walked from the store to her daughter's car a short distance away in the parking lot. Defendant grabbed Ramos from behind and pulled a gold chain from around her

---

[1]    All statutory references are to the Penal Code unless otherwise stated.

[2]    Defendant originally was jointly charged with Lawrence Slaughter and Maxamillion Lee McDonald, but their cases were severed. Only defendant's case is before us on this appeal.

During trial, the court dismissed an allegation the murder was committed by means of lying in wait (§ 189) and the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)). Jurors were unable to reach a verdict on the gang enhancements (§ 186.22, subd. (b)(1)) alleged as to counts 1 and 2, and the allegations were dismissed on the prosecutor's motion.

2.

neck knocking her to the pavement in the process and causing her to hit her back and head. Defendant then ran out of the parking lot and was picked up in a vehicle by fellow gang members McDonald and Slaughter. The vehicle, which had been in the grocery store parking lot for several minutes before Ramos was accosted, then sped off.

Ramos was taken to the hospital. She was pronounced dead a short time later. The forensic pathologist who performed the autopsy stated the cause of death as "emotion stress by precipitated sudden cardiac death due to marked excitation and emotional stress associated with physical exertion during robbery confrontation," and "cardiac dysrhythmia or irregular heartbeat associated with blunt force trauma to the trunk and the extremity."

## DISCUSSION

### I

### DENIAL OF MOTION FOR CHANGE OF VENUE

Defendant unsuccessfully sought to change trial venue out of Kern County. He says the trial court erred by denying his motion. We disagree.

### A.    Background and Procedural History

Defendant was tried after McDonald and Slaughter had already been convicted. He moved, in limine, for a change of venue. In support, he submitted six different articles published in the local newspaper, on that newspaper's Internet site, and on a local television station's Internet site.[3] The first, dated September 5, 2012, recounted the arrest of the three suspects, gave their names and ages and a brief recap of the crime and Ramos's cause of death, and referred to defendant as an "AB 109 Probationer." The article named Patterson as the suspect who took Ramos's necklace, and explained that AB 109 allows nonviolent, nonserious, and nonsex offenders to serve their sentences in

---

[3]    Defendant actually submitted eight articles, but in two instances, the same article was published both in the local newspaper and on that newspaper's Internet site.

3.

county jails instead of state prisons. The second (not dated) recounted Slaughter's conviction, and included a brief recap of the crime, that McDonald was convicted on April 8, and that Patterson was scheduled for a readiness hearing. The third article, dated May 14, 2013, reported on Slaughter's sentencing, and quoted Ramos's daughter as saying of the other defendants, "'One down, two to go.'" The article stated Slaughter's attorney believed defendant might be willing to testify Slaughter had nothing to do with the robbery. The fourth article, dated June 14, 2013, recounted McDonald's April 2013 conviction and continuance of sentencing, and contained a brief recap of the crime, including defendant's and Slaughter's names. The fifth article (not dated) recounted another continuance in McDonald's sentencing and again contained a brief recap of the crime. The final and most recent article, dated September 18, 2013, recounted McDonald's sentencing and contained essentially the same recap of the crime as was contained in the prior articles.

Defendant's motion was heard October 2, 2013. The court decided it would examine individually those prospective jurors who claimed hardship and/or had knowledge of the case. It asked the attorneys to prepare a short statement of the case sufficient to trigger recollection in someone with such knowledge, and to include mention of the taking of a necklace, since that was a common theme in the articles. The court then denied the motion without prejudice, subject to it being renewed after completion of individual voir dire.

Jury selection began that same afternoon, with an initial panel of 80 prospective jurors being summoned. Ultimately, a second panel of prospective jurors was also examined. Pursuant to the factual statement prepared by counsel, the court told each panel:

> "This is a homicide case where the defendant is accused of one count of first degree homicide with special circumstances alleged. The name of the decedent is Guadalupe Ramos. The homicide occurred on August 19, 2012, at Foods Co located at 2505 Haley Street in east

4.

Bakersfield. Guadalupe Ramos had her necklace taken in the parking lot of Foods Co. She later died at Kern Medical Center."

As to each panel, the court temporarily excused those prospective jurors who did not believe they had a hardship or prior knowledge of the case, but required all others to remain. Those who claimed hardship or knowledge were then individually examined outside the presence of other prospective jurors.

According to the trial court's count, 78 prospective jurors remained at the conclusion of individual voir dire. Defendant renewed his motion for a change of venue, arguing that more than 30 of the remaining prospective jurors had some knowledge of events.[4] He acknowledged, however, that when examined by the court, all said they could set aside their prior knowledge of the case. The prosecutor observed that very few had extensive knowledge, and he argued all could be fair.

The court stated it was satisfied all the remaining prospective jurors who had some knowledge of the case were honest when they said they could set that knowledge aside, and they understood their duty to decide the case based solely on the evidence presented in the courtroom. It observed that most had very limited knowledge, and that most who had more than minimal knowledge were excused, particularly if they had formed strong opinions. Based on the number of prospective jurors still available to try the case, and taking into account the factors to be considered with regard to a change of venue, the court found no reasonable likelihood defendant would be unable to receive a fair and impartial trial in Kern County. Accordingly, it denied the renewed motion, but gave defendant leave to raise the issue at the conclusion of jury selection if necessary.

Defendant did not challenge for cause any of the remaining prospective jurors who had knowledge of the case. He did, however, use 18 of his 20 peremptory challenges to

---

**4** By our count, 36 said they had prior knowledge of the case but could set it aside and decide the case based solely on the evidence presented in court. An additional 15 were excused because of doubts they could set aside what they knew.

remove such individuals. Before exercising his 20th and final peremptory challenge, defendant moved at sidebar for additional challenges for the same reasons he asked for a change of venue. He also renewed his change of venue motion based on the fact some 36 or 37 prospective jurors remained who had knowledge of the case. The court denied both motions.

With respect to the three alternate jurors, defendant exercised two peremptory challenges against prospective jurors with knowledge of the case. The defense announced its acceptance of the alternates despite the fact Juror No. 2909379, who had knowledge of the case from what he or she had seen on television and read in the paper several months or more before trial, remained.

The trial and alternate jurors were sworn on October 7, 2013. Juror No. 2909379 was seated as a trial juror on October 15, 2013, after another trial juror was excused for cause. Juror No. 2909379 was the only one of the trial jurors with knowledge of the case.

**B.     Analysis**

"'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.'" (*People v. Panah* (2005) 35 Cal.4th 395, 447; § 1033, subd. (a).) "'[R]easonable likelihood'" means something less than "'more probable than not,'" but something more than "merely 'possible.'" (*People v. Bonin* (1988) 46 Cal.3d 659, 673, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Each case is resolved on its own facts, and the moving party bears the burden of proof. (*People v. Sanders* (1995) 11 Cal.4th 475, 505.)

"In contrast to pretrial appellate review by way of a petition for a writ of mandate, review on appeal is retrospective. Thus, 'any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact

received a fair trial.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 360.) "On appeal, "'the defendant must show both that the [trial] court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was not *in fact* had."' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 943.)

"'On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county.…' [Citation.] 'Both the trial court's initial venue determination and our independent evaluation are based on a consideration of five factors: "(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim."' [Citation.]" (*People v. Suff* (2014) 58 Cal.4th 1013, 1044-1045.)

With regard to the first factor, "[t]he peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." (*Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582.) Special-circumstance murder is an offense of "utmost gravity," even when the death penalty is not sought. (*Williams v. Superior Court* (1983) 34 Cal.3d 584, 593.) The murder in the commission of a robbery involved here is an extremely serious offense; thus, this factor favors, but does not compel, a change of venue. (See *People v. Davis* (2009) 46 Cal.4th 539, 578; *People v. Weaver* (2001) 26 Cal.4th 876, 905.) Although the somewhat unusual circumstances of the offense impact the nature of the case, these are matters that "will not change with a change of venue." (*People v. Edwards* (1991) 54 Cal.3d 787, 808.) "'Prospective jurors

7.

would sympathize with [Ramos's] fate' no matter where the trial was held, and this sympathy stems from the nature of the crime, 'not the locale of trial.' [Citation.]" (*People v. Davis*, *supra*, 46 Cal.4th at p. 578.)

The second factor — the nature and extent of the news coverage — weighs against a change of venue. Defendant submitted little in the way of media coverage; all was relatively brief, factual, and not sensational. (See *People v. Suff*, *supra*, 58 Cal.4th at p. 1048; *People v. Adcox* (1988) 47 Cal.3d 207, 232.) Although the most recent article appeared only a couple of weeks before defendant's trial and recounted the sentencing of an alleged coperpetrator, defendant fails to convince us the trial court's individual voir dire of those prospective jurors with knowledge of the case was insufficient to significantly reduce any potential prejudice.[5] (See *People v. Suff*, *supra*, 58 Cal.4th at p. 1049.)

Defendant calculates that nearly half the prospective jurors available for group voir dire had knowledge of the case. Even if we were to interpret this fact as suggesting the pretrial publicity was considerably more extensive than shown by the evidence defendant presented to the trial court, however, "[p]ervasive publicity alone does not establish prejudice. [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1214.) "'"It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."'" [Citations.]" (*People v. Panah*, *supra*, 35 Cal.4th

---

[5] For instance, defendant points to one prospective juror's statement that "[i]t's been all over the television news, social media, newspaper. It's a pretty well publicized case. And unless you are living under a rock, I mean, you have heard about it." However, this prospective juror described himself as "an avid news watcher," who "like[s] to know what's going on." Yet even he said he had not heard anything about a trial involving persons other than defendant who allegedly were involved in the case. Moreover, this prospective juror was excused for cause. Even those prospective jurors who, according to defendant, alluded to the number and prominence of news reports on the subject all clarified those reports appeared nearer to when the crime happened, and that they could not recall hearing or seeing anything about the case within the last several months.

at p. 448.)  "The relevant question is not whether the community remembered the case, but whether the jurors at [defendant]'s trial had such fixed opinions that they could not judge impartially the guilt of the defendant.  [Citation.]  It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed."  (*Patton v. Yount* (1984) 467 U.S. 1025, 1035.)  "[J]uror *impartiality … does not require ignorance.*  [Citations.]" (*Skilling v. United States* (2010) 561 U.S. 358, 381.)  The California Supreme Court has upheld denial of venue changes in cases involving considerably greater recognition and formation of opinion.  (See, e.g., *People v. Harris* (2013) 57 Cal.4th 804, 825-826 [72 percent of participants in defendant's telephonic survey recognized case; of those, 55 percent said defendant was definitely or probably guilty of murder and 45 percent said he should receive death penalty]; *People v. Rountree* (2013) 56 Cal.4th 823, 838-839 ["high" percentage of community had heard of case and "many" had formed opinion regarding defendant's guilt]; but see *People v. Williams* (1989) 48 Cal.3d 1112, 1128-1130 [venue should have been changed where 52 percent of prospective jurors had read or heard of case; eight of 12 jurors ultimately seated had read or heard of case; and substantial percentage of venire knew victim, victim's family, or people in district attorney's office].)

Insofar as the record before us shows, many of the prospective jurors had little or no knowledge beyond the basic facts of the case that were reported early on, and stated they either had formed no opinion as to guilt or had not formed a fixed opinion, and could base a verdict solely on the evidence presented at trial.  (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1323.)  In fact, none of the original trial jurors professed to have knowledge of the case, and the alternate juror who had some knowledge and who became a trial juror partway through trial could only recall that a lady was robbed of a necklace and knocked down.  He had no doubt about his ability to set aside what he had heard and decide the case based solely on the evidence presented in the courtroom.  The trial court

9.

found credible his statements, as well as those of the other prospective jurors who remained after individual voir dire, and excused those who had prejudged defendant's guilt or did not appear able to return a verdict based solely on the trial evidence. We will not substitute our evaluation of credibility for the trial court's determination in that regard. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1146; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

It is true "the fact that the jurors declared they could decide the case impartially on the evidence does not preclude the necessity of a change of venue." (*People v. Daniels* (1991) 52 Cal.3d 815, 853; see *People v. Cooper* (1991) 53 Cal.3d 771, 807 [juror declarations of impartiality not conclusive].) "'In exceptional cases, "'adverse pretrial publicity can create such a *presumption* of prejudice in a community that the jurors' claims that they can be impartial should not be believed,' [citation] ...." [Citation.] "The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the [United States Supreme] Court has presumed prejudice can only be termed extraordinary, [citation], and it is well-settled that pretrial publicity itself—'even pervasive, adverse publicity—does not inevitably lead to an unfair trial' [citation]." [Citation.] This prejudice is presumed only in *extraordinary* cases—not in every case in which pervasive publicity has reached most members of the venire.' [Citation.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1086.)

"The present case does not fall 'within the limited class of cases in which prejudice would be presumed under the United States Constitution.' [Citation.]" (*People v. Farley*, *supra*, 46 Cal.4th at p. 1087; see *Beck v. Washington* (1962) 369 U.S. 541, 557.) Although jurors' assurances of impartiality are not dispositive, we are not free to ignore them. (*People v. Rountree*, *supra*, 56 Cal.4th at p. 841.) The record presents no

reason to doubt the actual jurors' and alternates' assertions they could be fair. (See *People v. Cooper, supra,* 53 Cal.3d at p. 807.)**6**

The third factor to be considered is the size of the community. "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness. [Citation.]" (*People v. Balderas* (1985) 41 Cal.3d 144, 178.) Conversely, "'[t]he smaller the community, the greater the likelihood the accused will not get a fair trial in a case of this nature.' [Citations.]" (*People v. Adcox, supra,* 47 Cal.3d at p. 233.)

This factor does not support a change of venue. Although the record does not reflect the population of Kern County at the time of trial, the California Supreme Court has long found this factor to be neutral, or even tilting against a change of venue, where Kern County is concerned. (See, e.g., *People v. Harris, supra,* 57 Cal.4th at p. 828 [population of 648,400 in 1999]; *People v. Rountree, supra,* 56 Cal.4th at p. 839 [population of 543,477 as of 1990 census]; *People v. Weaver* (2001) 26 Cal.4th 876, 898, 905 [population exceeding 450,000 at time of 1984 trial]; *People v. Murtishaw* (1989) 48 Cal.3d 1001, 1015 [population of 405,600 in 1981].)

Turning to the final factors — the status of the defendant, and the prominence and popularity of the victim — we conclude they are neutral or weigh against a change of venue. Neither defendant nor Ramos was an outsider to the community (see *People v. Daniels, supra,* 52 Cal.3d at p. 852), and while it is apparent Ramos was loved by those

---

**6** Defendant argues the "intense" publicity "could" have affected those claiming to have no knowledge of the case, because once they were in trial hearing evidence, such jurors were "likely" to remember they had in fact previously heard news reports on the subject, and their family and acquaintances were "likely" to influence jurors' ability to remain impartial. These assertions are sheer speculation, and the notion publicity was "intense" is not borne out by the record. Nothing about this case "'suggests a community with sentiment so poisoned against [defendant] as to impeach the indifference of jurors who displayed no animus of their own.' [Citation.]" (*People v. Farley, supra,* 46 Cal.4th at p. 1085.)

who knew her, she was not a prominent person. (See *People v. Rountree*, *supra*, 56 Cal.4th at p. 839.) Any posthumous prominence she achieved through news accounts, or perceived prominence her daughter achieved through media appearances, did not favor a change of venue; in light of the fact Ramos led a relatively quiet life, "the community was not likely to have experienced a uniquely heightened sense of loss or anger which would presumably be alleviated by trial in another county. Any sympathetic features of the case would be apparent wherever it was tried." (*People v. Webb* (1993) 6 Cal.4th 494, 514-515; see *People v. Adcox*, *supra*, 47 Cal.3d at pp. 233-234.) Likewise, any unsympathetic features of the case — for example, defendant's gang affiliation and criminal record (status as an "AB 109 Probationer") — would also be apparent wherever the case was tried. (See *People v. Harris*, *supra*, 57 Cal.4th at pp. 828-829.)

Considering the foregoing factors as a whole (*People v. Gallego* (1990) 52 Cal.3d 115, 167), "[o]ur independent evaluation of the record leads us to conclude that defendant failed to demonstrate that it was reasonably likely that (1) he could not receive a fair trial in the absence of a change of venue, or (2) he did not in fact receive a fair trial. Therefore, denial of defendant's motion for a change of venue did not deprive him of due process of law or a fair trial." (*People v. Suff*, *supra*, 58 Cal.4th at p. 1050.)

## II

### IMPOSITION OF CONSECUTIVE TERM ON COUNT 3

The trial court imposed a sentence of life in prison without the possibility of parole on count 1 (murder in the commission of robbery). It stayed sentence on count 2 (robbery), pursuant to section 654, because count 2 arose from the same set of operative facts as count 1.[7] It ordered the three-year term imposed for count 3 (gang participation)

---

[7]     Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

12.

to run fully consecutive to the sentence imposed on count 1, however, because there was "no gang element" in count 1 or its enhancements or special allegations.[8] Defendant now contends, and the Attorney General appropriately concedes, the trial court was required to stay sentence on count 3 pursuant to section 654.

In *People v. Mesa* (2012) 54 Cal.4th 191 (*Mesa*), the defendant shot victims in two separate incidents. In each, he was convicted of and punished for assault with a firearm, possession of a firearm by a felon, and actively participating in a criminal street gang. (*Id*. at p. 193.) With respect to the latter count, the trial court instructed the defendant's jury that the term "'[f]elonious criminal conduct'" meant committing or attempting to commit assault with a firearm or felon in possession of a firearm, and the only acts shown by the evidence with regard to each incident were that the defendant possessed the firearm and shot each victim. (*Id*. at p. 197.) The California Supreme Court stated:

> "For each shooting incident, defendant's sentence for the gang crime [section 186.22, subdivision (a)] violates section 654 because it punishes defendant a second time either for the assault with a firearm or for possession of a firearm by a felon. 'Here, the underlying [felonies] were the act[s] that transformed mere gang membership—which, by itself, is not a crime—into the crime of gang participation.' [Citation.] … '[S]ection 654 precludes multiple punishment for both (1) gang participation, one element of which requires that the defendant have "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of th[e] gang" [citation], and (2) the underlying felony that is used to satisfy this element of gang participation.' [Citation.] Section 654 applies where the 'defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself.' [Citation.]" (*Mesa*, *supra*, at pp. 197-198.)

---

[8]   Section 186.22, subdivision (a) prescribes punishment for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang …."

The high court found unpersuasive "reliance on multiple criminal objectives or the separate 'gravamen' of the gang crime to support multiple punishment .…" (*Mesa*, *supra*, 54 Cal.4th at p. 199.) The court observed: "Our case law has found multiple criminal objectives to be a predicate for multiple punishment only in circumstances that involve, or arguably, involve, multiple acts. The rule does not apply where, as here …, the multiple convictions at issue were indisputably based upon a single act. The rule was not intended to permit multiple punishment in such cases because it would violate the plain language of section 654." (*Ibid.*)

The *Mesa* court rejected arguments that "the gang crime involved a divisible course of conduct that consisted of defendant's (1) active participation in the gang and (2) knowledge of the gang's pattern of criminal activity, which happened over several years and were not the product of a single act," and that "participating in a criminal street gang is an act different from the act of shooting the victims or possessing a firearm." (*Mesa*, *supra*, 54 Cal.4th at p. 200.) It reasoned:

> "[E]lements (1) and (2) do not complete the offense under section 186.22, subdivision (a). The third element—willful promotion, furtherance, or assistance in felonious conduct by members of the gang—is essential because that is what 'transform[s] mere gang membership—which, by itself, is not a crime—into the crime of gang participation.' [Citation.] Here, the evidence of the shooting or firearm possession offenses committed by defendant was the only evidence that he promoted, furthered, or assisted felonious criminal conduct by members of the gang. As defendant notes, the information alleged that defendant committed each assault and related gang participation offense *on the same day*; in other words, he committed both offenses simultaneously. The gang crime punishes defendant for doing more than the act of shooting the victims or possessing a firearm, but there is no question that defendant's act of shooting the victims or possessing a firearm is punished by the gang crime." (*Ibid.*)

In the present case, the trial court instructed the jury, in pertinent part, that in order to prove the crime charged in count 3, "each of the following elements must be proved: [¶] One, a person actively participated in a criminal street gang; two, the members of that

14.

gang engaged in or have engaged in a pattern of criminal gang activity; three, that person knew that the gang members engaged in or have engaged in a pattern of criminal gang activity; and, four, *that person directly and actively committed the crime of robbery*." (Italics added.) The court instructed the jury that in order to prove the crime charged in count 1, "each of the following elements must be proved:  one, a human being was killed; two, the killing was unlawful; and, three, *the killing occurred during the commission of a robbery*." (Italics added.) In his summation, the prosecutor told jurors that "[a]ll the charges presented to you … come from that one incident, from the robbery on August 19, 2012 at 6:54 p.m. at the Foods Co. on Haley Drive." He also argued that in considering count 3, jurors would have to decide, inter alia, "[d]id [defendant], himself, willfully assist, promote, or further any felonious conduct in this case?  Did he directly perpetrate a robbery?"

In light of the foregoing and the fact the only evidence presented at trial supporting defendant's active participation in a criminal street gang was the evidence associated with the other charged offenses, *Mesa* controls. The trial court was required to stay sentence on count 3.[9]

## DISPOSITION

The judgment is modified to stay, pursuant to Penal Code section 654, the sentence on count 3. As so modified, the judgment is affirmed.

---

**9**  Defendant's failure to object at sentencing did not forfeit the issue for purposes of appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17.)

Stay of sentence on count 3 does not affect the trial court's orders, with respect to that count, that defendant register under section 186.30 (see *In re Jorge G.* (2004) 117 Cal.App.4th 931, 942-943; *People v. Bailey* (2002) 101 Cal.App.4th 238, 244), pay an assessment under section 1465.8 (*People v. Sharret* (2011) 191 Cal.App.4th 859, 865; *People v. Crittle* (2007) 154 Cal.App.4th 368, 370-371), or pay an assessment pursuant to Government Code section 70373 (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483-484).

15.

The trial court is directed to cause to be prepared an amended abstract of judgment reflecting said modification, and to forward a certified copy of same to the appropriate authorities.

_____
DETJEN, Acting P.J.

WE CONCUR:

_____
FRANSON, J.

_____
PEÑA, J.