Filed 5/27/16  P. v. Garcia CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD GARCIA,<br><br>    Defendant and Appellant. | B261824<br>(Los Angeles County<br>Super. Ct. No.  BA407121) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Richman, Judge.  Affirmed as modified.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General and Susan Sullivan Pithey, Deputy Attorney General, for Plaintiff and Respondent.

Appellant Edward Garcia challenges his judgment of conviction for first degree murder, contending there is insufficient evidence to support the jury's determination that the murder was willful, deliberate, and premeditated. We reject his challenge to the sufficiency of the evidence. We also conclude, that the trial court miscalculated appellant's presentence custody credits, we modify the judgment to remedy that error and affirm the judgment so modified.

## RELEVANT PROCEDURAL HISTORY

On August 1, 2013, an information was filed charging appellant with the murder of Angel Mancilla (Pen. Code, § 187, subd. (a)).[1] The information alleged that appellant had used a firearm, causing great bodily injury and death (§12022.53, subds. (b), (c), (d)). Appellant pleaded not guilty and denied the special allegations.

A jury found appellant guilty of first degree murder, and found the gun use allegations against him to be true. The trial court sentenced appellant to a total term of 50 years to life.

## FACTS

A. *Prosecution Evidence*

The key prosecution witness was Kristen Martinez, Angel Mancilla's girlfriend. According to Martinez, Mancilla belonged to the El Sereno gang. She testified that appellant and Mancilla did not get along while in high school, where they belonged to rival tagging crews. Later, in 2011 or 2012, she and Mancilla

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

twice encountered appellant at a market. On one occasion, appellant approached their car, angrily directed Mancilla to get out, and reached for something in his pocket. The incident ended when Mancilla ignored appellant and drove away.[2]

Martinez testified that on January 19, 2013, at approximately 10:00 p.m., she and Mancilla, accompanied by his one-year-old nephew, drove to a taco truck located on Huntington Drive in El Sereno. They intended to buy food for Mancilla's mother, and were driving her gray Impala. Mancilla was not armed. When they arrived at the taco truck, Martinez saw appellant standing nearby. As they pulled up, appellant stared at Mancilla. Mancilla told Martinez that appellant was from Clover, which she knew to be a street gang. As Mancilla parked his car, appellant walked over to a man near the taco truck. After approximately a minute, appellant drove away from the taco truck in a white Malibu. Also in the Malibu were the other man Martinez had seen and two teenage girls. Mancilla then ordered some food from the taco truck and returned to the Impala.

Martinez testified that after five minutes, appellant drove back to the taco truck with the man she had seen. Appellant parked in front of Mancilla's vehicle and "power walk[ed]" toward Mancilla. Appellant's companion ran after him. As appellant approached, he lifted his arms in a motion that raised his shirt, disclosing a gun in his waistband. Upon seeing the gun, Martinez said to Mancilla, "Let's go," and "No, not now, let's not do this now."

Martinez testified that Mancilla left the Impala and met appellant on the sidewalk near the taco truck. Mancilla asked, "Where are you from?," and "Do you know where you are?" Appellant came close to Mancilla, stuck out his hand

---

[2]    Jose Serna, Mancilla's brother, also testified that there was a longstanding "beef" between appellant and Mancilla, and that appellant once pretended to have
*(Fn. continued on next page.)*

3

as if to invite a handshake, and said, "[L]et's squash it," or "Let's quash it." When Mancilla replied, "No," appellant said, "[Y]ou disrespected my pad. You disrespected my pad." As the two men argued, appellant's companion repeatedly urged appellant to "calm down." Mancilla told appellant, "[J]ust don't disrespect me. My family is here. Not right now." Appellant then grabbed the gun from his waistband and shot Mancilla twice. Before being shot, Mancilla never touched appellant, and his arms were down at his sides when appellant fired. Following the second shot, Mancilla fell to the ground. Appellant shot Mancilla a third time, then drove away in the Malibu with his companion.[3]

Jose Montano testified that on January 19, 2013, he ordered food from the taco truck on Huntington Drive. While waiting for his food, he noticed two men arguing near a car. One man pulled up his shirt, revealing a gun. Upon seeing the gun, Montano retreated behind the taco truck, where he heard four gunshots. Montano saw the man with the gun run to a white Malibu, which drove away. The other man was on the ground. Nearby, a woman was crying.

Joseph Ybarra testified that on the date of the shooting, he bought food from the taco truck. After two men in a white Malibu drove away from the taco truck, a gray car parked near the truck. The gray car's driver ordered some food and then stood near his car. After five minutes, the two men returned in the white Malibu. While one remained near the Malibu, the other walked to the gray car and spoke to its driver. They began to argue, and moved close together. Ybarra heard the man from the Malibu twice say, "[Y]ou disrespected my pad." The gray car's driver

---

a gun when he saw Mancilla and Martinez at a market.

[3] An audio recording of Martinez's police interview following the shooting was played for the jury.

4

reached toward the waist of the other man, who pulled out a gun and shot the gray car's driver. Ybarra fled behind the taco truck, where he heard the shooter shout, "You disrespected my pad." Ybarra then saw the shooter fire his gun several times at the gray car's driver, who was on the ground. Inside the gray car, a woman was crying. The shooter returned to the Malibu, which drove away. Ybarra then called 911.[4]

Police officers responding to the shooting found only fragments of bullet projectiles, but no bullet casings. On January 23, 2013, a search warrant was executed at appellant's residence. In appellant's bedroom, police found a loaded .45 caliber handgun, some brass knuckles, and an Apple iPhone. Service provider records for the iPhone showed that at the time of the shooting, it was in the area of the taco truck. Investigating officers determined that a round trip from the taco truck to appellant's residence and back was 1.3 miles in length, and that it took approximately three minutes and fifteen seconds to drive at 20 to 25 miles per hour.

Dr. Stephen Scholtz, a forensic pathologist, performed an autopsy on Mancilla's body. According to Scholtz, Mancilla died of multiple gunshot wounds. Mancilla displayed wounds from two bullets that entered the upper left side of his body, passed through his chest and abdomen, and exited his body on the right side of the collarbone and abdomen. There was also a superficial skin injury consistent with a gunshot graze wound on Mancilla's right shoulder.[5]

---

[4] An audio recording of Ybarra's 911 call was played for the jury.

[5] In addition to these witnesses, the prosecution called Los Angeles Police Department Officer Juan Cobian, a gang expert, who testified that appellant displayed tattoos characteristic of the Clover street gang.

5

B. *Defense Evidence*

Appellant denied that he intended to shoot Mancilla. According to appellant, prior to the shooting, he first had "issues" with Mancilla when Mancilla acted in a hostile manner during encounters at a market. On one occasion, Mancilla came close to hitting him with a car Mancilla was driving, and on another, Mancilla demanded to know his gang affiliation.

Appellant further testified that on January 19, 2013, he, a male friend, and two young women went to the taco truck, which appellant knew to be a location where El Sereno gang members were sometimes present. As they were ordering food, appellant saw Mancilla arrive. Because appellant had been involved in "incidents" with Mancilla, he decided to leave the taco truck. Appellant, his friend, and the women then drove to a motel. When the women asked for the food they had ordered, appellant decided to return to the taco truck.

Appellant further testified that upon arriving at the taco truck, he did not see Mancilla. As appellant walked toward the taco truck to retrieve the ordered food, Mancilla said, "Hey, fool. Where you from?" Appellant replied that he wanted no trouble, and intended only to get his food and leave. Mancilla asked, "You know where you at?," which appellant interpreted as an assertion that he was in Mancilla's territory. Appellant's friend approached and said, "Let's kick back. Everything is cool." Appellant extended his hand to Mancilla and asked, "If it's cool can we quash it[?]" He also raised his shirt to show that he was unarmed.

According to appellant, Mancilla partially withdrew a gun from his pocket. Appellant lunged for the gun, resulting in a wrestling match between himself and Mancilla. Appellant heard two pops, and saw Mancilla fall to the ground. Appellant then fled. He denied firing gunshots at Mancilla while he was on the ground.

6

On direct examination, appellant acknowledged that he falsely told investigating officers that he was not present at the taco truck during the shooting. On cross-examination, appellant acknowledged that he also falsely denied owning a cell phone and falsely denied having "beefs with anybody with El Sereno . . . ." He further admitted that he asked his girlfriend to tell the police that at the time of the shooting, he was with her in a hotel room.[6]

C. *Rebuttal*

Los Angeles Police Department Detective Douglas Kirkland testified that he listened to more than 300 hours of recorded phone calls made by appellant while in jail. According to Kirkland, appellant repeatedly told others that he was not present during the shooting, and never mentioned acting in self-defense.

**DISCUSSION**

Appellant contends there is insufficient evidence to support his conviction for willful, deliberate, and premeditated murder. He maintains that Mancilla's murder was not deliberate and premeditated, arguing that the evidence shows only that in killing Mancilla, he "act[ed] rashly as a result of the escalating confrontation with Mancilla." As explained below, we reject his contention.[7]

---

[6] Excerpts from audio recordings of appellant's police interview and phone conversation with a girlfriend were played for the jury.

[7] "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably

*(Fn. continued on next page.)*

Generally, "'"[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]"'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Nonetheless "'"[p]remeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" [Citation.]' [Citations.]" (*Mendoza*, *supra*, 52 Cal.4th at p. 1069, quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

"The necessary elements of deliberation and premeditation may be inferred from all the facts and circumstances as will furnish a reasonable basis for such inferences, and where the evidence is not in law insufficient, the matter is exclusively a question for the trier of fact to determine. [Citations.] Proof of circumstances occurring at the time of the killing, as well as circumstances before and after the killing, are competent to show deliberation and premeditation. [Citations.]" (*People v. Mulqueen* (1970) 9 Cal.App.3d 532, 544.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), our Supreme Court identified three kinds of evidence a reviewing court should consider in

---

deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

determining the existence of premeditation and deliberation, namely, planning activity, motive, and manner of killing.[8] It has subsequently cautioned that these categories are "guidelines," rather than "the requirements for proving premediation and deliberation." (*People v. Young* (2005) 34 Cal.4th 1149, 1183.) They "are descriptive and neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight. [Citations.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

An instructive application of the *Anderson* categories is found in *People v. Wells* (1988) 199 Cal.App.3d 535 (*Wells*). There, the victim, a gang member, went to a dance with friends and encountered the defendant, who belonged to a rival gang. (*Wells, supra,* 199 Cal.App.3d at p. 538.) At some point, a fist fight broke out between the victim and other members of the defendant's gang. (*Ibid.*) The defendant took out a gun and fired it in the air; he then followed the fleeing victim and fired the gun at least three times at the victim over a period of 10 to 15

_____

[8] In *People v. Lenart* (2004) 32 Cal.4th 1107, 1127, the court summarized the three *Anderson* categories as follows: "'(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'"

seconds. (*Ibid*.) The victim suffered three bullet wounds, one of which was fatal. (*Id.* at p. 539.)

The appellate court determined there was sufficient evidence of premeditation and deliberation by reference to the *Anderson* categories. (*Wells*, *supra*, 199 Cal.App.3d at p. 535.) Regarding motive and manner of killing, the court pointed to the evidence of a pre-existing violent rivalry between the gangs, and the evidence that the defendant fired a warning shot to clear the dance floor before methodically firing at the victim. (*Id*. at pp. 540-541.) Regarding planning, the court observed that although there was no evidence the defendant had planned to target his specific victim before arriving at the dance, "planning could have begun moments before [he] fired a shot into the ceiling . . . ." (*Id*. at p. 540.) The court further determined that the defendant's possession of a gun, by itself, was "consistent with intent to kill a rival gang member . . . ." (*Id*. at p. 541.)

Here, Martinez's testimony, together with the other evidence, supported the inference that appellant, who had a longstanding "beef" with Mancilla, spotted him at the taco truck, briefly left the scene, returned with the intention of confronting Mancilla, and then killed him. According to Martinez, appellant and Mancilla had been unfriendly since high school, and had had hostile encounters in the past. On the day of the shooting, Mancilla was unarmed when he and Martinez drove to the taco truck. When they arrived, appellant first stared at Mancilla, then hurriedly left with his male and female friends, and returned with only his male companion. Appellant "power walk[ed]" toward Mancilla's car, purposefully displaying a gun in his waistband. When Mancilla went to talk to appellant and declined his invitation to "squash" or "quash it," appellant accused Mancilla of "disrespect[ing his] pad." After Mancilla said, "[J]ust don't disrespect me. My family is here. Not right now," appellant shot Mancilla twice from only a few feet

away.  According to Martinez, Mancilla neither touched nor moved toward appellant, and Mancilla's hands were at his sides.  After Mancilla fell to the ground, appellant shot him a third time.

Assessed in light of the *Anderson* categories, the record discloses sufficient evidence of premeditation and deliberation.  Appellant's prior hostile conduct toward Mancilla and accusations that Mancilla had "disrespected [his] pad" demonstrate a motive for the murder.  Appellant's decision to return to the taco stand armed with a gun in order to press his accusations shows planning, notwithstanding the absence of direct evidence that he left the taco stand in order to obtain the gun, because he came back without his female acquaintances.  Furthermore, the manner of killing -- by multiple gunshots at close range -- was consistent with deliberation and premeditation, rather a sudden violent impulse, as Mancilla made no provocative act prior to the shooting.  Indeed, appellant fired a third shot at Mancilla while he lay on the ground.

Appellant contends that Mancilla was responsible for the violent culmination of the encounter, pointing to the evidence that Mancilla asked, "Where are you from?," and "Do you know where you are?," when he first spoke to appellant, and then declined to shake appellant's hand.  We disagree.  According to Martinez, while the men were arguing, Mancilla never  touched or moved toward appellant.  After Mancilla asked appellant not to disrespect him, noting that his family was there, appellant responded by shooting him.  Mancilla's remark cannot reasonably be regarded as a provocation.[9]

---

[9]  Appellant suggests that Mancilla laughed when he "confronted" appellant.  However, although the record discloses that Mancilla left his car and talked to appellant, there is no evidence that Mancilla laughed in appellant's presence.  On
*(Fn. continued on next page.)*

11

The cases upon which appellant relies are distinguishable.  In *Anderson*, a jury found the defendant guilty of the first degree murder of a 10-year old girl.  (*Anderson*, *supra*, 70 Cal.2d at p. 19.)  When discovered in the defendant's house, the victim's body disclosed more than 60 knife wounds all over her body, including her genitals; moreover, part of her tongue had been cut off.  (*Id*. at

---

cross-examination, Martinez testified that when questioned by the police, she said that appellant's white Malibu reappeared at the taco stand while she and Mancilla were in their car.  The following testimony then occurred:

"Q.  And your boyfriend said they are back and started laughing; is that correct?

"A.  No.

"Q.  Didn't you tell the police that --

"A.  I said they are back.

"Q.  Who started laughing?

"A.  I don't remember saying that.

"Q.  So you're not saying it didn't happen.  It's just that you don't remember saying that your boyfriend said they're back, and he started laughing?

"A.  I don't remember."

In a related contention, appellant also maintains that the evidence regarding the location of Mancilla's wounds is irreconcilable with Martinez's testimony that appellant's first two gunshots struck Mancilla's chest.  Appellant here misapprehends our role of review for substantial evidence. We do not resolve conflicts in the evidence, but instead affirm the jury's determinations if they are supported by any logical inferences grounded in the evidence.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11-14.)  Montano testified that he heard four gunshots, and Ybarra testified that he saw the shooter fire several shots at his victim, who was on the ground.  The jury thus could reasonably conclude that the two fatal shots were fired after Mancilla fell to the ground.

12

pp. 21-22.) Although the victim's blood and clothing were found in various locations within the house, no evidence was presented regarding the events immediately preceding the victim's death. (*Id.* at pp. 19-22.) Our Supreme Court concluded that the evidence was insufficient to establish first degree murder, reasoning that the brutality of the killing, by itself, could not support a finding of premeditation and deliberation. (*Id.* at pp. 24-34.) In contrast, as explained above, the circumstances preceding Mancilla's killing establish premeditation and deliberation.

In *People v. Mendes* (1950) 35 Cal.2d 537, 540, the defendant fled from a deputy sheriff who attempted to search him, and after a brief chase, fatally shot the deputy. The Supreme Court determined there was insufficient evidence of premeditation and deliberation, as the incident lasted only six to eight seconds, and there was no evidence that the deputy was in uniform when he tried to search the defendant. (*Mendes, supra,* 35 Cal.2d at pp. 544-545.) Here, appellant had a longstanding "beef" with Mancilla, as well as ample time to plan and deliberate prior to shooting him.

In *People v. Fields* (1950) 99 Cal.App.2d 10, the defendant and his victim were longtime friends. Following an afternoon of drinking, they arrived at the defendant's home, "both showing the effects of liquor but being 'friendly and in good spirits.'" (*Fields, supra,* 99 Cal.App.2d at p. 10.) They left for a café, where they argued first with the owner and then with each other. (*Id.* at pp. 10-11.) Eventually, the victim took the defendant home to his family and assisted him in getting into his house. (*Id.* at p. 11.) The men entered the house with their arms around each other and did not appear to be angry. (*Id.* at pp. 11-12.) Several minutes later, however, the defendant grabbed a rifle near a dresser and fatally shot the victim, thereafter discharging the gun in the direction of his sister-in-law

13

and wife. (*Id*. at pp. 11, 12.) The appellate court concluded there was insufficient evidence to support the defendant's conviction for first degree murder, stating: "The evidence indicates that this killing occurred as a result of one of those sudden and unconsidered impulses upon which men in the condition of appellant not uncommonly act, and which they regret after even slight reflection, rather than as a result of any deliberation or premeditation." (*Id*. at p. 13.) That is not the case here. The evidence shows that appellant, who had long felt animosity toward Mancilla, deliberately and with due reflection resolved their dispute by fatally shooting Mancilla, and then repeatedly denied doing so. In sum, there is sufficient evidence to support the jury's determination that Mancilla's murder was deliberate and premeditated.

A. *Custody Credits*

Appellant contends the trial court miscalculated his presentence custody credits. The trial court awarded him custody credits totaling 722 days. He argues that he is entitled to credit for an additional two days of actual custody. Respondent agrees. We conclude that appellant's custody credits must be corrected to reflect a total of 724 days.

14

## DISPOSITION

The judgment is modified to reflect that appellant is entitled to custody credits totaling 724 days. The trial court is directed to correct the sentencing minute order to reflect the modification stated above, to prepare an amended abstract of judgment reflecting that modification, and to forward the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTIN, P. J.

COLLINS, J.

15